In re **KENDAVIS INDUSTRIES INTER-NATIONAL, INC.,** Kendavis Holding Company, Loffland Brothers Company, Mid–Continent Supply Co., Geodril, Inc., Loffland Brothers Eastern Hemisphere, Inc., Loffland Brothers (Singapore) PTE, Ltd., Debtors.

**Bankruptcy No. 385–30348–HCA–11.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Sept. 28, 1988.

Fred Shannon, Martin, Shannon & Drought, Inc., San Antonio, Tex., Locke, Purnell, Rain, Harrell, P.C., Dallas, Tex., for Locke, Purnell, Rain, Harrell, P.C.

Ogden N. Lewis, Davis, Polk & Wardwell, New York City, for Morgan Guar. Trust Co. of New York.

Julia Dobbins (John Blinn, Stephen Goodwin and J. Michael McBride, formerly with the firm), Shannon, Gracey, Ratliff & Miller, Fort Worth, Tex., for Official Unsecured Creditors' Committee.

David Snodgrass, Gardere & Wynne, Dallas, Tex., for Sec. Pacific Nat. Bank.

Thomas E. Kurth, Haynes & Boone, Dallas, Tex., for InterFirst Bank Dallas, N.A. and InterFirst Bank Fort Worth, N.A. (InterFirst is now First RepublicBank).

Henry Gompf, Jones, Day, Reavis & Pogue, Dallas, Tex., for Kendavis Holding Co., Loffland Bros. Co., and Mid–Continent Supply Co.

Jerry Beane, Strasburger & Price, Dallas, Tex., for First Interstate Bank of California.

J. Maxwell Tucker, Winstead, McGuire, Sechrest & Minick, Dallas, Tex., for MBank–Houston.

## REVISED * FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING MOTION FOR DISGORGEMENT OF COMPENSATION PAID TO LOCKE, PURNELL, BOREN, LANEY & NEELY

HAROLD C. ABRAMSON,
Bankruptcy Judge.

One of a bankruptcy court's least favorite duties is the enforcement of the Code provisions dealing with compensation of professionals. In dealing with these provisions, the Court is not likely to win any popularity contests. Yet, it is inherently the Court's duty to examine professional compensation, and to act where problems are discovered. This case demonstrates a variety of problems on the part of counsel for the Debtor including conflicts of interest, lack of benefit to the estate, and failure to disclose compensation. It also demonstrates the problems inherent in a popular theory regarding representation of Debtors in bankruptcy, the concept of the "potential" conflict of interest. Ultimately, this case demonstrates what happens when a case is allowed to proceed with a "potential" conflict of interest, and the Court is hopeful that it has demonstrated that a "potential" conflict is a contradiction in terms.

## I. INTRODUCTION

Came on to be considered the Joint Motion for Disgorgement of Compensation and Reimbursement of Expenses Paid to Locke, Purnell, Boren, Laney & Neely ("Locke Purnell") filed by the Official Unsecured Creditors' Committees ("Committees"); Security Pacific National Bank; Morgan Guaranty Trust Company of New York; InterFirst Bank Dallas, N.A. and InterFirst Bank Fort Worth, N.A. (InterFirst is now named First RepublicBank); and MBank–Houston, N.A., (collectively "Movants"); and the Court, after a consideration of the pleadings filed, including detailed briefs, after a review of the relevant legal authorities, and after hearing extensive argument of counsel, is of the opinion that the motion should be granted, and further finds as follows:

## II. FINDINGS OF FACT AND BACKGROUND RELEVANT TO ALL OTHER FINDINGS

1. These cases were initiated by the filing of involuntary bankruptcy petitions under 11 U.S.C. § 303 on February 21, 1985, against Kendavis Holding Company ("KHC") and Kendavis Industries International, Inc. ("KIII").

---

* Pursuant to Rule 60(a), Federal Rules of Civil Procedure.

2. The Debtors consented to the petitions, and Orders for Relief were entered on March 19, 1985.

3. Debtor, KHC is a Nevada corporation. Directly, or indirectly, it owned more than 80% of the outstanding common stock of 20 operating companies, including the other debtors in this proceeding.

4. At various times following the filing of these cases, petitions were filed either voluntarily or involuntarily against various subsidiaries or entities related to these two debtors. Between 1985 and 1986, Orders for Relief were entered against several of these entities.

5. During the course of these proceedings, the Court authorized the law firm of Locke, Purnell, Boren, Laney & Neely, now known as Locke Purnell Rain Harrell, to represent the debtor entities.

6. The Debtors in these proceedings attempted more than once to confirm various plans of reorganization. None of those plans were able to reach standards necessary to permit confirmation.

7. On February 3, 1986, competing plans were filed by the Debtor on one hand, and by the Creditors' Committees on the other.

8. Pursuant to Court Order, hearings on the Debtors' Third Amended Joint Plan of Reorganization came on for consideration on May 7, 1986, prior to hearings on the Committees' Plan.

9. At the close of the Debtors' case in chief on June 22, 1986, the Committees moved for judgment denying confirmation of the Debtors' Plan under Federal Rule of Civil Procedure 41(b).

10. The Committees' motion was granted on June 24, 1986. An Order and supplemental findings were entered on August 6, 1986.

11. Hearings on the Committees' Plan began on June 26, 1986 and continued until November 12, 1986. At the conclusion of the hearings, the Court filed its order and findings confirming the Committees' Plan of Reorganization for KHC and KIII. The Committees' Plan was denied for Loffland Brothers Company.

12. Soon after confirmation, the reorganized Debtor sought to replace Locke Purnell, and retain the services of Jones, Day, Reavis & Pogue.

13. The Locke Purnell firm continued to act in the name of the Debtors in appealing the order confirming the Committees' Plan of Reorganization.

14. The District Court for the Northern District of Texas dismissed the Debtors' appeal and affirmed the denial of confirmation of the Debtors' Plan on March 26, 1987. *In re Kendavis Holding Co.*, No. CA3–86–2995–G, slip op. at 4 (D.Tex. Mar. 26, 1987).

15. The United States Court of Appeals for the Fifth Circuit let stand the District Court's orders on September 24, 1987. *In re Kendavis Holding Co.*, No. 87–1251, slip op. at 3 (5th Cir.1987) [830 F.2d 1128 (table)] (per curiam).

16. Acting on instructions from this Court, Locke Purnell did not file for a writ of certiorari to the United States Supreme Court. However, attorneys working on behalf of the Davis family interests filed for a writ. The writ was denied by the Supreme Court on June 20, 1988. *In re Kendavis Holding Co.*, No. 87–1251, slip op. at 3 (5th Cir.1987) (per curiam), *cert. denied,* —— U.S. ——, 108 S.Ct. 2845, 101 L.Ed.2d 882 (1988).

17. During the course of the bankruptcy case, Locke Purnell made several fee applications to the Court. Committee members filed objections to Locke Purnell's fee applications at least 19 times. These objections included many of the objections contained in the Motion for Disgorgement. These objections included:

(i) Lack of beneficial results accruing from Locke Purnell's representation of the Debtors,

(ii) Actual conflicts of interest on the part of Locke Purnell in connection with its representation of the Debtors,

(iii) Unwarranted and intentional delay in the conduct of the proceedings.

18. Later in the proceedings, the Committee raised other objections to Locke Purnell's interim fee applications, including:

(i) Locke Purnell's participation in a fraud on the Court by presenting a set of

allegedly "cooked" financial statements to the Court,

(ii) Locke Purnell's breach of various fiduciary duties in connection with its representation of the Debtor entities,

(iii) Failure of Locke Purnell to meet the Fifth Circuit's requirements for approval of compensation.

19. Locke Purnell has been awarded interim compensation in an amount in excess of $4,000,000.00 for its activities in these cases.

20. The Orders entered by the Court approving Locke Purnell's interim fee applications were intended by the Court to be interim, and subject to reexamination at the conclusion of the case.

21. The Bankruptcy Judge originally handling this case discovered that he had a disqualification. Therefore, he recused himself, and the case was transferred to this Court on March 26, 1987.

22. On November 9, 1987, the Committee filed its Joint Motion for Disgorgement of Compensation and Reimbursement of Expenses Paid to Locke Purnell.

23. On January 11, 1988, Locke Purnell filed its Answer to Factual Contentions Contained in the Joint Motion for Disgorgement of Compensation and Reimbursement of Expenses and its Brief in Opposition to the Motion.

24. On February 29, 1988, this Court held an evidentiary hearing on the Committees' assertion that Locke Purnell improperly failed to disclose a retainer from which it made withdrawals.

25. On April 28, 29, and May 2, 1988, this Court held evidentiary hearings on the remaining contentions contained in the Committees' Motion.

26. The Court accepted proposed findings of fact and conclusions of law from the parties on July 11, 1988.

III. COMMENT REGARDING THE COURT'S POWER TO DETERMINE THIS CONTROVERSY—LAW OF THE CASE

One side issue raised in this proceeding is whether this Court has the authority to address the issues raised in the Committees' motion. The Court believes that this issue was adequately addressed by the Court orally at an early hearing, but a restatement is perhaps appropriate here.

Locke Purnell has suggested that this Court lacks authority to determine this controversy, based on the Law of the case doctrine. Locke Purnell notes that its previous interim fee applications were approved by order of the Court. In those orders, various findings were made regarding Locke Purnell's right to payment under the applicable provisions of the Bankruptcy Code. Locke Purnell suggests that the findings in these orders are binding on this Court. In short, Locke Purnell argues that the Court lacks authority to alter its previous fee orders. The Committees take the position that the orders previously entered by the court were exactly what they were titled—interim. That is, the original judge handling this case never intended for the awards of fees to be final. Instead, the Committees argue, the judge intended to reexamine the fees at the conclusion of the case. This Court has made a finding that the original judge handling this case did not intend for his interim fee orders to be final.

The Court is also of the opinion that all fees awarded prior to the end of a case are by definition interim, and may be reviewed by the Court at the close of the case. *See, e.g., In re Callister,* 673 F.2d 305, 306–07 (10th Cir.1982). However, these conclusions are not necessary to determine whether this Court has authority to hear the Committees' motion. The Court holds that Locke Purnell's arguments regarding the Court's authority are based on a mistaken interpretation of the Law of the case doctrine. A review of the Law of the case doctrine highlights the error.

The Law of the case doctrine is actually several related doctrines, and Locke Purnell is confusing two of them. Under one "heading" is the rule that a lower court must follow the ruling of a higher court. Compliance with the ruling of higher

courts is non-discretionary for a lower court. However, under another "heading," the Law of the case doctrine is discretionary. The Law of the case doctrine in this instance is a rule of discretion which justifies a court's refusal to rehear what has already been determined in a single proceeding before the same court. In other words, it is a discretionary rule which enables a court to defeat the efforts of a die-hard litigant. The distinction between these aspects of the Law of the case doctrine is illuminated by the commentators Wright & Miller, Federal Practice & Procedure, § 4477, (1981), and cases cited therein. While it is certainly appropriate that a court have some type of rule limiting argument on topics upon which the court has ruled, it is not a binding restriction. A trial court is free to reconsider its previous decisions whenever it is necessary. *Id.* at 789.

The cases support this interpretation of the rule. In *Slotkin v. Citizens Casualty Co.*, 614 F.2d 301, 312 (2d Cir.1979), the court held that the Law of the case doctrine is not a limitation on the power of the court, rather it is merely an expression of the general practice of refusing to reopen what has already been decided. The Fifth Circuit has made similar statements, holding that the Law of the case doctrine is not an "inexorable command, but rather a rule of practice limited in scope." *Falcon v. General Telephone Co.*, 815 F.2d 317, 319 (5th Cir.1987), (quoting *Todd Shipyards Corp. v. Auto Transportation, S.A.*, 763 F.2d 745, 750 (5th Cir.1985)).

 Even if Law of the case were controlling, one of the several exceptions to the rule would apply in this instance. First, where new evidence is presented, the rule yields. *Johnson v. Bernard Insurance Agency, Inc.*, 532 F.2d 1382, 1384 (D.C.Cir.1976). In this case, the Committee has presented new evidence. In fact, a great deal of the evidence presented was not even available to the Committees at the time of Locke Purnell's interim fee applications. Second, to relieve manifest injustice, law of the case may waiver. *Wrist–Rocket*

*Mfg. Co. v. Saunders Archery Co.*, 578 F.2d 727, 730–31 (8th Cir.1978). In this case, an injustice to the creditors of the estates would occur if Locke Purnell were awarded more than its due. Third, a court need not await reversal before correcting errors. Instead, the Court must address errors when they are discovered. *Champaign–Urbana News Agency, Inc. v. J.L. Cummins News Co.*, 632 F.2d 680, 683 (7th Cir.1980).

The only possible conclusion which can be reached from these authorities is that it is eminently within the Court's power to hear and decide the Committees' motion.

## IV. STANDARDS FOR GRANTING PROFESSIONAL FEES

To properly evaluate the Committees' motion, the Court must consider the standards applicable to attorney fees under the Bankruptcy Code. This involves consideration of the relevant statutes and cases. Much of the material in this section will serve as the basis for conclusions of law made in subsequent sections.

The Bankruptcy Code gives the Court the power to control the award of attorney fees. 11 U.S.C. § 330 (1982 & Supp. IV 1987). This section authorizes a court to inquire into and limit compensation from any source. *See, In re Furniture Corporation of America*, 34 B.R. 46 (Bankr.S.D. Fla.1983). The purpose of section 330 was to "guard against a recurrence of the 'sordid chapters' in the history of fees in corporate reorganizations." S.Rep. No. 989, 96th Cong., 2d Sess. 40, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5826 (quoting *Dickinson Industrial Site, Inc. v. Cowan*, 309 U.S. 382, 388, 60 S.Ct. 595, 599, 84 L.Ed. 819 (1940)). It is interesting to note that many of the comments made regarding the disinterestedness requirement at early congressional hearings remain relevant today.[1]

The Bankruptcy Code gives only the most general guidance as to standards to be applied in awarding attorney fees to

---

1. "The record of corporate reorganizations ... is not pleasant. It shows the absolute control exercised over reorganizations by the inside few; it shows the financial well-being of inves-

tors and the public sacrificed to the insiders' desire for protection and for profit ... It shows that these delays, these futile prolongations of the agony of reorganizations were frequently

counsel for a debtor. Section 330 limits an attorney to "reasonable compensation for actual, necessary services ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services." 11 U.S.C. § 330(a) (1982 & Supp. IV 1987).

■ Section 327(a) of the Code provides other clues relevant to compensation of attorneys. This section states a two prong test for the employment of attorneys. First, the attorney for the Debtor must hold no adverse interest to the bankruptcy estate. Second, the attorney must be a disinterested person. *In re Leisure Dynamics, Inc.,* 33 B.R. 121, 122 (D.Minn. 1983). Section 101 of the Code defines a "disinterested person" as one who "does not have any interest materially adverse to the interest of the estate ... by reason of any direct or indirect relationship to, connection with, or interest in the debtor ... or for any other reason." 11 U.S.C. § 101(13)(E) (1982). Further, Section 328(c) allows the Court to deny compensation to a professional in any case where "such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate." 11 U.S.C. § 328(c) (1982). In other words, where an attorney for a debtor is found to be interested, disallowance of attorney fees is appropriate. *In re Chou–Chen Chemicals, Inc.,* 31 B.R. 842 (Bankr.W.D.Ky. 1983).

The case law has been informative in filling out the requirements for payment of professional persons in a bankruptcy case. One of the most prominent cases discussing compensation of professionals is *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). This case gives us the so called *Johnson* factors. The *Johnson* factors were made applicable to bankruptcy proceedings in the Fifth Circuit in *In re First Colonial Corp. of America,* 544 F.2d 1291 (5th Cir.1977). Of the twelve *Johnson* factors listed in those opinions,

the Fifth Circuit has instructed that courts pay special heed to:

(i) the time and labor involved,

(ii) the customary fee,

(iii) the amount involved and the results obtained, and

(iv) the experience and reputation of counsel.

*Copper Liquor, Inc. v. Adolph Coors Co.,* 624 F.2d 575, 583 (5th Cir.1980). The Fifth Circuit has also instructed that a judge explain the findings and reasons upon which the award is based, including an indication of how each of the twelve factors in *Johnson* affected his decision. *First Colonial,* 544 F.2d at 1300.

■ Additionally, ethical considerations are proper for the Court to consider when ruling on the propriety of awarding professional fees. This is because ethical violations or conflicts of interest may lessen the value of services. *In re Coastal Equities, Inc.,* 39 B.R. 304, 312 (Bankr.S.D. Cal.1984). If an attorney holds an undisclosed adverse interest, a court is empowered to deny all compensation. *Id.* at 308; *In re Guy Apple Masonry Contractor, Inc.,* 45 B.R. 160, 163 (Bankr.D.Ariz.1984).

It is these broad overall standards which this Court must apply in consideration of the Committees' motion. Additionally, other general legal rules may apply to a specific claim made by the Committees. These rules will be noted and applied where appropriate throughout this opinion.

## V. SPECIFIC FINDINGS REGARDING CLAIMS MADE BY THE COMMITTEES' MOTION

### CLAIM NUMBER I:

*Locke Purnell Represented Interests Adverse to the Estate*

### FINDINGS OF FACT

*i. Introduction to Findings of Fact*

1. The Committee suggests that Locke Purnell represented interests which were

due to deliberate sabotage by a group which had something to gain and was unwilling to compromise ... The record also shows, with overwhelming proof, that plans of reorganization were frequently dictated by a single interest—by a closely knit inside group; primarily in the

interests of that group and of dubious wisdom so far as interest outside the inner circle were concerned."

H.R.Rep. No. 1409, 75th Cong., 1st Sess., at 38 (1937) (statement of Justice William O. Douglas).

adverse to the interests of the bankruptcy estate, and that those interests directly led to excesses committed by Locke Purnell in delaying the case, and engaging in unproductive, unnecessary litigation. The most damaging of the Committees' assertions is that Locke Purnell actually represented the interests of the principals of the Debtors, the Davis family, and that representation was a fatal conflict of interest for which Locke Purnell should not be compensated from the estate.

2. Locke Purnell counters by maintaining that their actions in this case were reasonable, and in the best interests of the estate.

3. As indicated in the following findings of fact, the Court finds for the Committees and holds that Locke Purnell had a fatal conflict of interest during its representation of the Debtors. The Committees' contention that Locke Purnell intentionally delayed these proceedings, and that Locke Purnell violated its fiduciary duties, is considered as part of the Committees' objection to Locke Purnell's conflict of interest.

*ii. The Debtors' Plan Was Designed Exclusively to Benefit the Shareholders —The Davis Family*

4. The Debtors in the bankruptcy proceeding were insolvent. Therefore, there was no equity interest, and the stockholders held no recognizable economic interest in the reorganization of these entities. This being true, the Debtors' Plan of Reorganization was inexplicably generous to the stockholders when compared with the treatment of senior classes of creditors.

5. The Debtors' Third Amended Plan was a so-called "Marston"[2] plan. That means that the principals of the Debtors were to make a cash contribution to "purchase" the Debtors. In return, the stockholders, primarily the Davis family, would be able to retain their interests.

6. Under the Debtors' Plan, the stockholders were to contribute $5,000,000.00 in new funds to the seven entities included in their plan. The Debtors' Plan also included a $20 million subordinated debt component to be paid over twenty years. Since, KHC and KIII owed collectively over $500,000,000.00 in institutional debt, this amount was considered a "drop in the bucket." That is, the proposed contribution was not a substantial contribution of new capital sufficient to justify the stockholders retaining their interests. *Norwest Bank v. Ahlers,* —— U.S. ——, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).

7. Debtors' Plan omitted a determination of a fair market price for the purchase of the Debtors because no competing bids for the purchase of the Debtors were ever solicited.

8. The terms of the Debtors' Plan contemplated a substantive consolidation of seven of the Debtors. The effect of this would have been particularly beneficial to a non-debtor corporation owned by Mr. Ken Davis. Had the Debtor Mid–Continent been reorganized alone, the unsecured creditors of Mid–Continent could have expected a return of something on the order of four cents on the dollar. Under the terms of the Plan proposed by the Debtors, the creditors of Mid–Continent, a co-debtor under the Plan, would have received a greatly increased return, on the order of seventy-three cents on the dollar. A major unsecured creditor of Mid–Continent was Great Western Drilling Company (GWDC), a non-debtor, with a $10,400,000.00 disputed claim. Mr. Ken Davis, the principal of all of the Debtors, owned 87% of GWDC's stock. The effect of the consolidation was to greatly benefit the person whom the Committees suggest Locke Purnell actually represented.[3]

9. Under the terms of the Debtors' proposed Plan, the creditors were to receive

---

**2.** *In re Marston Enterprises, Inc.,* 13 B.R. 514 (Bankr.E.D.N.Y.1981).

**3.** It is interesting to note that the requested substantive consolidation was in name only, the assets of the companies were never actually to be combined for purposes other than confirmation of the plan itself. Immediately upon implementation of the plan, the Debtors would have become separate entities. Effectively, the substantive consolidation was effective only to claims against the estates.

partial payment over a period of 20 years, through a Sinking Debenture. During this period, no provision was made for the creditors to share in any potential "upside" growth in the company.[4]

### iii. Locke Purnell's Opposition to the Committees' Plan was Designed to Benefit the Shareholders—the Davis Family

10. The Committees' Plan called for 100% payment of all non-bank and non-insider creditors.

11. No substantial legitimate non-insider creditors objected to the Committees' Plan.

12. Locke Purnell vigorously opposed the Committees' Plan of reorganization, despite the fact that their objections could benefit only the interest holders, primarily the Davis family.

### iv. The Sale of Cummins Sales & Service, Inc., as Proposed by Locke Purnell, Benefitted the Interest Holders, —the Davis Family

13. During the course of these proceedings, the Debtors proposed to sell one of the involuntary debtor corporations, Cummins Sales & Service, Inc. ("Cummins"). The terms of that sale included a $4,000,-000.00 non-competition clause in favor of two of the Debtors' principals, Mr. Ken Davis and Mr. Cullen Davis.

14. The draft agreement originally provided that the payment of the $4,000,000.00 non-competition compensation would be paid to the Debtor estates. Counsel for Locke Purnell was aware or should have

been aware that the original draft of the sales agreement called for the Debtors to receive the funds. Yet when Locke Purnell presented the proposal to the Court, the agreement had been changed to provide that the funds were to go to the Davis brothers individually.

15. The Court finally did approve the sale, but reserved decision on use of the disputed funds.

### v. Substantial Documentary Evidence Exists Which Calls Into Question Locke Purnell's Disinterestedness

16. Numerous correspondence from members of the Davis family to various attorneys at Locke Purnell indicates that the Davis family, at least, believed that Locke Purnell was working to benefit the family's interest exclusively.

17. Other correspondence from various attorneys for Locke Purnell to members of the Davis family uses language which casts doubt on where Locke Purnell's loyalties truly lay—with the Debtors, or with the Davis family.

18. Correspondence between the Davis family and other of the Debtors' professionals, such as accountants, indicates that the Davis family, at least, regarded the entire reorganization proceeding to be in their exclusive interest. One letter, Movant's Exhibit 34 [5], from Ms. Kay Davis on behalf of Mr. Ken Davis indicated the story of this Chapter 11. Mr. Davis instructed Locke Purnell to lay waste to all, unless the banks agreed to his terms of settlement. He dictated a war of "scorched earth" leaving what remained after the battle to the institutional creditors.[6] Locke

---

4. For instance, if the oil-field service industry experienced growth during the course of the plan, the increase in value of the debtor corporations would not accrue to the benefit of the unsecured creditors, despite the fact that those creditors were to receive only partial payment under the proposed plan. Effectively, any "upside" growth would benefit only the interest holders, primarily Mr. Ken Davis.

5. Attached as an Addendum.

6. Movant's Exhibit 37, a letter dated September 13, 1985 from Mr. Ken Davis to Mr. James W. Harris of Lehman Brothers, states:

> My present reaction is to disregard the all rhetoric by the banks of what's acceptable and what's not and plan to fight to the last ditch for what is acceptable to us and not be persuaded by anything you are told by any banker.
>
> I don't think I can be very proud of selling out.
>
> An easier approach would be to sell off all the companies, leave me with a minority interest and I could quit work, go fishing, and live off dividends.

Purnell followed this dictate and was paid handsomely on interim fee applications.

19. An agenda for a Plan of Reorganization meeting was sent from an attorney with Locke Purnell to Mr. Ken Davis. In that agenda, a negotiating strategy was scheduled that "[k]eeps K.D. [Mr. Ken Davis] behind the Scenes and Provides Deniability."[7] Further in the agenda, a listed objective of the meeting group was an attempt to maximize the retention of assets by the Davis family, and to buy time for a turnaround in the oil market.

20. The Davis family was never represented by counsel before this Court throughout the term of the proceedings prior to confirmation. Members of the family did, however, appear individually at two hearings.

### vi. Locke Purnell Intentionally Delayed the Proceedings

The banks have contended the following, and the Court makes no findings with regard to these allegations by the Movants because the subject matter of this contention (as to the factual questions of disinterestedness and adverse interests) is treated above.

21. The actions of Locke Purnell in this case indicate that the firm actively sought to lengthen the proceedings to ridiculous extremes.

22. During the course of the proceedings, Locke Purnell engaged in excessively litigious conduct, including:

 i. unnecessarily detailed cross-examination of witnesses,

 ii. unnecessary objections,

 iii. bad faith filings, including a counter-claim against the Committees which Locke Purnell knew to be without basis.

### CONCLUSIONS OF LAW

#### i. Representation of Adverse Interests

█ It is apparent to this Court from the Findings of Fact that Locke Purnell had serious conflicts of interest in representing the Debtors, their affiliates, and equity

owners in these bankruptcy cases. The courts of this circuit are "sensitive to preventing conflicts of interest and [that] requires a 'painstaking analysis of the facts and precise application of precedent.'" *In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1256 (5th Cir.1986) (quoting *Brennan's, Inc. v. Brennan's Restaurant, Inc.*, 590 F.2d 168, 173–74 (5th Cir.1979)). The evidence supporting the finding of a conflict of interest in this case is admittedly circumstantial, since neither Locke Purnell nor the Davis family has ever stated that Locke Purnell represented anyone other than the Debtors. Further, each piece of evidence, taken alone, would probably be insufficient to find Locke Purnell guilty of conflict of interest. However, from the totality of the evidence, together with the objective manifestations of Locke Purnell's conduct throughout this proceeding can lead to only one factual conclusion—that Locke Purnell actually represented the interests of the Davis family throughout the pendency of the case and that representation was a conflict of interest. For the Court to reach the legal conclusions to be applied, the Court must consider many of the legal principles discussed in the preceding section entitled Standards for Granting Professional Fees.

█ The inevitable conclusion of law drawn from the facts as they appear to this Court are similar to those which faced a Bankruptcy Court in the Southern District of Texas, and the conclusion is the same:

> Thus while it was not totally apparent to the Court during the pendency of this action (pre-confirmation), it seems abundantly clear now that the activities of Skadden, Arps during this proceeding best served the *principals* of Coral Petroleum, Inc. rather than the debtor, its estate, and its creditors ... this Court concludes that in this proceeding Skadden, Arps was acting in the best interest of the *principals* of Coral Petroleum during the time they were appointed by the Court as attorneys for the debtor-in-possession.

---

7. Movant's Exhibit 62 at III(E)(2)(b)(1).

This raises most serious issues of conflicts of interest and of benefit to the estate.

*In re Coral Petroleum, Inc.,* No. 83–02460–H2–5, slip op. at 3 (Bankr.S.D.Tex. Jan. 30, 1988).[7a] This Court finds that a similar situation occurred in the present case. The activities of Locke Purnell best served the principals of KHC, primarily the Davis family. Locke Purnell's actions in this case were designed to further the interests of their primary client, the Davis family. Therefore, serious conflict of interest problems arise, and questions as to the benefit of Locke Purnell's service to the estate are apparent. It is plain to this Court from the Findings of Fact, that Locke Purnell was not disinterested during its term as counsel for the Debtors. A law firm must exercise impartial and undivided loyalty on behalf of a client, and is therefore prohibited from representing conflicting interests. *In re Paine,* 14 B.R. 272, 274 (W.D.Mich. 1981). Representing the principals of the debtor, and not the debtor itself lacks the disinterestedness required by section 327, because once counsel is employed, "a lawyer owes his allegiance to the entity and not to the stockholder, director, officer, employee, representative or other person connected with the entity." *In re King Resources Co.,* 20 B.R. 191, 200 (D.Colo.1982); *See also, In re Hoffman,* 53 B.R. 564, 566 (Bankr.W.D.Ark.1985); *In re Watson Seafood & Poultry Co.,* 40 B.R. 436, 442 (Bankr.E.D.N.C.1984). In this case, members of the Davis family were the primary and controlling shareholders of the Debtors. Further, members of the Davis family were directors, officers, and employees of the Debtors. Locke Purnell's actions attempting to benefit the Davis family at the expense of the estates fit the definition of a conflict of interest.

As was previously discussed, section 327 of the Code describes a two prong test for the employment of counsel for a debtor. A law firm which is not disinterested does not meet the second prong to that test. Locke Purnell's representation of the Davis family was an "interest materially adverse to the interest of the estate ... by reason of [a] direct or indirect relationship to, connection with, or interest in the debtor ..." 11 U.S.C. § 101(13)(E) (1982); *See also, Consolidated Bancshares,* 785 F.2d at 1256, quoting, 2 *Collier on Bankruptcy* § 327.03 at 327–19, 20 (15th ed. 1985) (disinterestedness includes "anyone who in the slightest degree might have some interest or relationship that would color the independent and impartial attitude required by the Code"). Therefore, Locke Purnell was not disinterested and its employment as counsel for the Debtors was, in retrospect, inappropriate.

The Bankruptcy Code provisions dealing with conflicts of interest find their counterparts in the ABA Code of Professional Responsibility. *In re Marine Power & Equipment Co.,* 67 B.R. 643, 654 (Bankr. W.D.Wash.1986). Therefore, the Canons and Disciplinary Rules are particularly relevant when considering alleged conflicts of interest. Especially relevant are Canons Five, Nine, and Four under the ABA Code of Professional Responsibility.

Canon Five requires an attorney to exercise independent professional judgment on behalf of a client. Disciplinary Rule 5–105 requires that an attorney refuse to accept employment if the interests of another client impair the independent professional judgment of the attorney. This rule requires that an attorney not place him or herself in a position where he or she may be required to choose between conflicting loyalties. *In re 765 Associates,* 14 B.R. 449, 451 (Bankr.D.Haw.1981). Representation of a shareholder, officer or director of a debtor corporation led to a situation in

---

**7a.** During the preparation of this opinion, District Court Judge DeAnda entered an order providing that Judge Wheless' January 30, 1988 memorandum in *Coral Petroleum* had been rendered "moot" and "of no further force and effect." *In re Coral Petroleum,* No. 88–1527 slip op. at 2 (D.S.D.Tex. July 7, 1988). While this Court is unaware of the subsequent event eliminating the element of controversy between the parties in *Coral Petroleum,* the language and analysis of the Bankruptcy Court opinion during its vibrancy remains pertinent for purposes of this decision.

this case where Locke Purnell's ability to exercise independent judgment on behalf of its client, the Debtors, was impaired.

Also relevant to a consideration of a possible conflict of interest is Canon Nine. Canon Nine provides that an attorney should avoid even an appearance of impropriety. It appears that most courts apply a type of balancing test when considering Canon Nine. As a general rule, counsel may be disqualified upon a "showing that there is a 'reasonable possibility of the occurrence of the specifically identifiable appearance of improper conduct.'" *In re Roger J. Au & Son, Inc.*, 64 B.R. 600, 605 (Bankr.N.D.Ohio 1986). Locke Purnell plainly violated this rule. Even if Locke Purnell arguably did not represent the Davis family, their actions throughout the case, as expressed in the Court's Findings of Fact, point to an inescapable appearance to the contrary. Counsel has been disqualified from representing parties in a bankruptcy proceeding solely for this "appearance of impropriety" grounds. *See, e.g., Id.* at 605 (noting that Canon Nine does not require the court to find actual evidence of ethical violations); *In re ESM Government Securities, Inc.*, 66 B.R. 82, 84 (S.D.Fla. 1986).

Also related is Canon Four. Canon Four requires that an attorney preserve the confidences and secrets of a client. This issue arises most frequently when an attorney has clients with claims against each other. The rule is relevant as it relates to a use of information obtained in regard to representation of a debtor, and using that information to the benefit of one client versus the other client. Where this situation arises, a conflict of interest is present.

Considering the above authorities, it is inescapable that Locke Purnell had a conflict of interest in representing the Debtors in these cases, whether under the ABA Code of Professional Responsibility, or under the Bankruptcy Code. The question remains as to what the Court should do to resolve the violation.

The Bankruptcy Code authorizes a court to disallow fees where a professional is found not to have been disinterested. 11 U.S.C. § 328(c) (1982). The cases are plainly in accord. Where a law firm is found not to be disinterested, disallowance of fees is appropriate. *Woods v. City National Bank and Trust Co.*, 312 U.S. 262, 266, 61 S.Ct. 493, 496, 85 L.Ed. 820 (1941) ("where an actual conflict of interest exists, no more need be shown in this type of case to support a denial of compensation"); *Wolf v. Weinstein*, 372 U.S. 633, 641, 83 S.Ct. 969, 975, 10 L.Ed.2d 33 (1963) ("a fiduciary may not receive compensation for services tainted by disloyalty or conflict of interest"); *In re Georgetown of Kettering, Ltd.*, 750 F.2d 536 (6th Cir.1984); *In re Chou–Chen Chemicals, Inc.*, 31 B.R. 842 (Bankr.W.D.Ky.1983); *In re Paine*, 14 B.R. 272 (Bankr.W.D.Mich.1981); *In re Coastal Equities, Inc.*, 39 B.R. 304 (Bankr.S.D.Cal. 1984); *In re Michigan General Corp.*, 77 B.R. 97 (Bankr.N.D.Tex.1987); *In re N.S. Garrott & Sons*, 63 B.R. 189 (Bankr.E.D. Ark.1986). The court may also order the return of fees already paid. *In re 765 Associates*, 14 B.R. 449 (Bankr.D.Haw. 1981); *In re B.E.T. Genetics, Inc.*, 35 B.R. 269 (Bankr.E.D.Cal.1983).

Perhaps the most unfortunate aspect of this case is the fact that many of the problems could have been avoided through simple precautions. It is apparent to this Court that problems with Locke Purnell's representation of the Debtors arose early in the case. Yet, Locke Purnell insisted that their conflict in this case was, at most, "potential" not "actual." It is that mistaken theory of law which allowed this case to reach the present point. A group of creditors acting to have legal fees paid to counsel for a debtor returned to an estate long after counsel for the debtor has surrendered representation. In this case, the concept of potential conflicts of interest has been harmful not only to the interests of the Debtors, but to the attorneys in the case. Had Locke Purnell's conflicts been acted on at the beginning of the case, they would not now be in the present situation.

The concept of potential conflicts of interest in bankruptcy is based on a mistaken interpretation of the Bankruptcy Code. Section 327 requires that counsel be "disin-

terested." 11 U.S.C. 327(a) (1982). The disinterested requirement is intended to "prevent even the appearance of conflict irrespective of the integrity of the person or firm under consideration." *In re Martin*, 817 F.2d 175, 181 (1st Cir.1987). Further, a "disinterested person should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters." *Id.* This Court would therefore join with the Pennsylvania court which questioned the decisions of courts finding potential conflicts of interest. *In re Paolino*, 80 B.R. 341, 345 (Bankr.E.D.Pa.1987). Locke Purnell's conflict of interest did not become actual sometime after they began representation of the Debtors. Instead, their conflict arose on the date they began representing the Debtors as well as representing the principals of the Debtors. Upon their employment, Locke Purnell was no longer disinterested, and therefore, they were not eligible to represent the Debtors.

 To make the Court's holding more concrete, the Court holds that whenever counsel for a debtor corporation has any agreement, express or implied, with management or a director of the debtor, or with a shareholder, or with any control party, to protect the interest of that party, counsel holds a conflict. That conflict is not potential, it is actual, and it arises the date that representation commences. This holding would apply equally to partnerships. An attorney who claims to represent a partnership, but also has some agreement, whether express or implied, with the general or limited partners, or with any control person, to protect its interest, that attorney has an actual conflict of interest, and is subject to disqualification and a disallowance of fees. The concept of *potential* conflicts is a contradiction in terms. Once there is a conflict, it is *actual —not potential.*

A historical basis exists for this rule interpreting section 327 of the Code. When Chapter X was enacted into law, the Congressional policy was stated in part as follows:

Under the bill the independent trustee will serve as the focal point for formulation and negotiation of a plan of reorganization. This important function under the present system has been left to the inside few. That normally has meant leaving it to the management and the investment bankers. It should no longer be left in these hands, since those persons too often have interests conflicting with those of the investors.

The content of the plan is the all-important item in the whole proceeding. Its preparation and negotiation should be carefully scrutinized and supervised. Placing this function in the hands of the independent trustee also means that greater opportunity for investor participation in the preparation of the plan can be afforded. Under the bill proposals of plans are not restricted to the favored few; it forsakes the tradition of leaving all of these matters to the insiders. By its provisions any investor can prepare, or submit proposals for, a plan. But the dangers of 'town meetings' are avoided by placing on the trustee the duty to head up the formulation of a plan and to report out a plan to the court within a reasonable time. The trustee, as a representative of the court, plays an active role in the formulation and negotiation of plans, and supplies scrutiny and control thereof in the interest of creditors and stockholders. In handling the suggestions of proposals for plans, the independent trustee would act in an informal administrative manner. He is made the active head of the reorganization process; he would provide an intermediate forum and round table where creditors and stockholders could be heard and could negotiate. In short, vital functions which in the past have been performed by inside groups or by protective committees seeking personal profit, will be vested in the trustee—with the advice and consent of creditors and stockholders and subject to court supervision. No longer will the basic, all-important phases of reorganization be performed by groups which have a selfish interest to protect and promote. Heretofore these groups

have thrived because they have provided leadership for investors where otherwise there would be anarchy; because they have seized the reins and produced action and provided directions—regardless of their destination. Under the bill these functions will be performed by a disinterested person appointed by the court with the opportunity to interested persons to express their views on the appointment."

H.R.Rep. No. 1409, 75th Cong., 1st Sess., at 38 (1937); *See also* Footnote 1, Page 747, *supra.*.

Section 156 of the Bankruptcy Act provided as follows:

> Upon the approval of a petition, the judge shall, if the indebtedness of a debtor, liquidated as to amount and not contingent as to liability, is $250,000 or over, appoint one or more trustees.

11 U.S.C. § 556 (1938) (Chapter X of the Chandler Act).

Chapter X required that the trustee as well as any attorney appointed to represent him be "disinterested," a term which is carefully defined. Collier on Bankruptcy 14th Edition, ¶ 7.01[2]. Section 158 of the Act and Bankruptcy Rule 10–202(c)(2), (the latter derived from Section 156), set forth the affiliations, connections and interests which disqualify persons from acting as disinterested trustees. In this Court's view, the Congressional intent, as evidenced upon the fusion of Chapters X, XI, and XII into the present Chapter 11 under the Code was to, insofar as possible, install the debtor in possession and its attorney as

fiduciaries with the similar obligations and powers as a trustee in the Chapter X, except for the investigative type powers. Further, it appears that the Congressional intent in the drafting of section 327 of the Code was to impose a fiduciary obligation analogous to that of the disinterested trustee in a Chapter X proceeding. However, in reality, although an attorney for a debtor corporation is usually not previously affiliated with that entity prior to the bankruptcy, he nevertheless expressly or impliedly accepts certain obligations of advice or aid to equity holders, management directors, and the like.

Some courts have taken varying positions as to why section 327(a) of the Code does not mean what it says. Some courts say that until a conflict of interest is *actual* it is not disqualifying; some say that only a potential conflict is not disqualifying until it becomes actual; other courts say that the equities of the case dictate whether there is a conflict of interest or whether it should be enforced.[8] Additionally, many articles have been written and lectures given to bankruptcy seminars by various attorneys with torturous rationale as to why a conflict is not a conflict until the court sees it as a real and actual conflict.[9] Some of those attorneys, and at least one court,[10] have relied upon the single enterprise theory [11] to justify the representation by one law firm of all multi-affiliated entities in a bankruptcy proceeding. It seems to this Court that those decisions and their rationale fly in the face of the specific language

---

**8.** *In re Roberts,* 75 B.R. 402, 413 (D.Utah 1987); *In re O.P.M. Leasing Services, Inc.,* 16 B.R. 932 (Bankr.S.D.N.Y.1982); *In re O'Connor,* 52 B.R. 892 (Bankr.W.D.Okla.1985) (de minimus adverse interest); *In re Martin,* 817 F.2d 175 (1st Cir.1987).

**9.** Exhibit No. LPRH–27, introduced into evidence by Locke Purnell, is an article in support of its position.

**10.** *In re S.I. Acquisition,* 58 B.R. 454 (W.D.Tex. 1986) *rev'd on other grounds,* 817 F.2d 1142 (5th Cir.1987). The Bankruptcy Court in the Western District of Texas in dictum so stated:

> Bankruptcy courts are seeing an increase in large parent corporations with multi-tiered subsidiaries. The "increased judicial recogni-

tion of the widespread use of interrelated corporate structures by subsidiary corporations operating with a parent entity's umbrella for tax and business planning purposes" will soon force courts to respond to this transition from entity to enterprise law.

. . . . .

> The "entity" concept and "piercing the corporate veil" jurisprudence must be replaced by an "enterprise" theory of law where evaluation of a cause of action relies on broader equitable principles governing conduct of fiduciaries on either an individual or interrelated corporate basis. (Citations omitted).

This Court disagrees.

**11.** Blumberg, *The Law of Corporate Groups* (1985).

of Congress in the drafting of section 327 of the Code, as well as completely ignoring the nonbankruptcy legal status and obligations of multi-affiliated entities.

Absent a bankruptcy scenario, the structure of a holding company with subsidiaries and affiliated entities is created so as to (a) insulate the group from failure of one or more entities, (b) insulate from unusual exposure of some entities to unusual liability, (c) and for issuance of securities on the public or private markets. Trade, institutional, and state tax entities rely on the separateness of the entities in extension of credit or collection of property or sales taxes. Separateness requires some constitutional protection for the creditors who relied on this structure.

The occurrence of a bankruptcy should not change the state created rights of the parties except in unusual circumstances. To allow one law firm's representation of the group results in its control of the case and exclusive billings as to all debtors. The basic motivation of the law firm seeking to be exclusive is potential remuneration, and achievement of the ends of management and equity. The need of the lawyer in the 1930's is now the greed of the lawyer in the 1980's.[12]

Furthermore, how can a bankruptcy court monitor actual conflicts of interest versus potential conflicts of interest when these matters come before the court in less than obvious ways? Unless a court is extremely experienced in bankruptcy tactics and negotiations, or unless a party in interest brings the matter before the court with a "smoking gun," no effective manner exists to monitor this problem. Also, the "potential conflicts" rationale leaves open the incurrence of fees and expenses by a law firm for a period of time until the court announces some decision finding actual conflicts of interest; this thereupon amounts to a late disqualification of counsel and disgorgement of all or part of fees which could have been avoided by early action in the case (assuming real compliance with section 327 of the Code).[13]

In the realities of bankruptcy law practice today, as was so in previous years, the attorney for the debtor in a Chapter 11 proceeding often encounters the situation where the debtor prior to bankruptcy has incurred substantial withholding taxes or other types of taxes which may flow through to the "responsible" persons. The control officers and directors of the closely-held corporation often times have signed guarantees of trade debt or institutional debt. In the larger publicly held corporation, management and directors are sometimes concerned about potential liability to shareholders or potential securities violations claims. Also in the large multi-affiliate cases, management is concerned about the need for consolidation of all of the entities in order to utilize all assets available to settle all debts of all the entities. There are also concerns in corporate cases about the retention of the equity position of shareholders without loss thereof.

In the partnership real estate cases of the 1980's, the syndicator-general partner is quite concerned about the tax consequences of a foreclosure of the property as impacting upon the limited partner equity holders. In these cases letters of credit have been furnished upon guarantees or collateral furnished by equity holders and the bankruptcy attorney is faced with the protection of these interests (whether he or she admits this or not). Therefore, the attorney for the debtor oft-times is in a position of negotiating terminations of stays upon release of guarantees; use of the Chapter 11 process to seek injunctions for the protection of guarantors or management; negotiation of a plan that

---

12. This observation is directed to our profession in general rather than as a criticism of the individual lawyers in this case.

13. This Court has had a graphic experience with such situations. In one case of multi-affiliated entities, one of which was a public company, after this Court disqualified counsel for the holding company and affiliated subsidiaries, a consensual confirmed plan was achieved within one year. All this was accomplished with new counsel for each corporate entity at no greater expense than the use of one firm. The Court foresees no reason to assume one large firm will represent several entities at less cost than one firm representing each entity.

encompasses the release of all co-obligors and guarantors upon confirmation. Is this not a similar situation that was discussed in House Report No. 1409 in 1937? *Deja vu?* As pointed out *In re Leisure Dynamics,* 32 B.R. 753, 756 (D.Minn.1983):

> "A debtor in possession has fiduciary responsibilities imposed upon it in dealing with property of the estate. See *Matter of Halux, Inc.,* 665 F.2d 213 (C.A. Minn.1981); *In re E. Paul Kovacs and Co., Inc.,* 16 B.R. 203 (Bkrtcy.D.Conn. 1981); and *In re Wesco Products Co.,* 22 B.R. 107, 9 B.C.D. 400 (Bkrtcy.N.D.Ill. 1982). Congress wanted an attorney with independence to "assist 'in carrying out' duties under [The Bankruptcy Code]". I agree."

The resolution of the problem lies with the Congress, not loose interpretation of section 327 by the Courts.

### CLAIM NUMBER II:

*Locke Purnell Failed to Disclose Payment of Fees and Wrongfully Caused a Debtor in Possession to Pay a $500,000.00 Retainer*

### FINDINGS OF FACT

#### i. Locke Purnell Failed to Disclose a Retainer

1. General findings regarding Locke Purnell's representation of the Debtors have already been noted in the Findings of Fact and Background Relevant to All Other Findings section; only a brief review is necessary regarding this claim by the Committees.

2. Beginning in February 1985, and continuing throughout the term of this bankruptcy proceeding, Locke Purnell was retained to represent KHC, KIII, and various of the KHC subsidiaries. Representation continued until May 13, 1987, when this Court ordered Locke Purnell to discontinue representation of the Debtors, effective April 29, 1987.

3. During the course of the bankruptcy case, Locke Purnell applied for interim fee awards. The Court approved many of these applications, subject to later review.

4. On November 8, 1985, subsequent to an Order for Relief being entered against KIII, Locke Purnell received a retainer in the amount of $500,000.00 from KIII.

5. A letter from an attorney with Locke Purnell to Mr. Ken Davis indicates that the retainer was for the representation of several Involuntary Debtors in bankruptcy. These so called "Involuntary Debtors" were some of the many KHC related entities brought before this Court during the course of these proceedings.

6. The retainer had been paid with a cashiers' check drawn on InterFirst Bank Fort Worth, N.A. The cashiers's check provided to Locke Purnell indicated that KIII was the purchaser of the check; nothing in the cashier's check mentioned the Involuntary Debtors, or indicated that they were the purchasers.

7. The cashier's check had been purchased with a check drawn on KIII's account at InterFirst. The check used to purchase the cashiers check was stamped "Debtor-in-Possession" Case No. 385-30348.

8. Although KIII was a Debtor in Possession, no disclosure of the retainer was ever made to the Court or creditors.

9. KIII had complete ownership and control of the funds maintained in the account on which the cashiers' check was drawn. At no time did KIII charge the accounts of the KHC subsidiaries for any part of the retainer or for any of the legal expenses which were later charged to the retainer.

10. It is impossible to determine the source of the funds in KIII's bank accounts. KIII had income from several sources, including bank loans, cash forwarded from the subsidiaries, and accounts receivable. These accounts receivable were primarily for funds transferred to the subsidiaries as loans from KIII to the Involuntary Debtors, and for management fees.

11. Locke Purnell placed the retainer into an interest bearing account and for two years did not make any charges against it. While maintaining the retainer,

Locke Purnell was paid over $700,000.00 by KIII on behalf of the Involuntary Debtors for legal services. Neither the retainer nor the accrued interest held by Locke Purnell was charged for fees.

12. On August 13, 1987, and again on November 4, 1987, well after confirmation of the Committees' Plan of Reorganization, and after Locke Purnell had been removed as counsel for the Debtors, Locke Purnell charged the retainer for legal services provided after confirmation of the Committees' Plan.

13. The amount charged was $99,380.63 for services rendered after April 14, 1987, primarily in connection with representation of the Debtor's appeal regarding confirmation of the Committees' Plan. At the time of this representation of the Debtors on appeal, this Court had not authorized Locke Purnell to conduct any action on behalf of the estates.

14. Locke Purnell did not make application to this Court for approval of its charging the retainer for their services prior to actually charging the retainer.

15. Locke Purnell has returned the unused portion of the retainer, yet they have refused to return the $99,380.63 which was charged for post-confirmation, post-removal as counsel for the debtor, legal expenses.

16. The petitions against the remaining Involuntary Debtors, whom Locke Purnell claimed to represent, were dismissed by the Court on August 25, 1987.

17. On October 7, 1987, KHC filed an Application for Order Requiring Locke Purnell Rain Harrell to Return Fee Retainer.

### ii. Undisclosed Payments of Fees to Locke Purnell

18. During the term of the case in which Locke Purnell was submitting interim fee applications to the Court for approval, they were also submitting bills to the Debtor, KIII, on account of work performed on behalf of the Involuntary Debtors.

19. Total billings were in the amount of $791,691.22; this amount includes the sum of $99,380.63 charged to the undisclosed

$500,000.00 retainer. This payment occurred after Locke Purnell was removed as counsel for the Debtors.

20. KIII paid these bills out of its Debtor in Possession account. Locke Purnell was aware of the fact that their legal fees for representation of the Involuntary Debtors were being paid by an adjudged Debtor in Possession.

21. These payments were not disclosed to the Court nor to the Committees nor were they revealed in the several cash management orders entered by the Court.

22. Locke Purnell failed to make complete disclosure of the sums being paid by KIII on account of the Involuntary Debtors.

### CONCLUSIONS OF LAW

### i. Jurisdiction of this Court to Determine the Controversy

Initially, a comment might be made regarding the Court's jurisdiction over the amounts in controversy. The parties stipulated, and the Court agrees, that the Court lacks jurisdiction over amounts paid to an attorney by an Involuntary Debtor until such time as an order for relief is entered or unless the Court fashions some other order. *See*, 11 U.S.C. § 303(f) (1982). However, the Committees and current counsel for the reorganized Debtors argue that the amounts in question were not paid by the Involuntary Debtors but were in fact paid by KIII, a debtor. Because the funds were paid by KIII, the Court has jurisdiction to determine whether the funds were property of the estate. This jurisdiction is apparent form several sources. First, the general jurisdictional statutes for bankruptcy cases indicate that the Court will have jurisdiction over all property of the Debtor, wherever located. 28 U.S.C. § 1334(d) (Supp. IV 1987); 11 U.S.C. § 541 (1982 & Supp. IV 1987). Second, because the transfer is alleged to be an unauthorized post-petition transfer of property of the estate, the matter would be core under 28 U.S.C. § 157(b)(2)(A), (E), (H) and (O) (Supp. IV 1987). Third, Article XII of the confirmed Plan of Reorganization

reserves in this Court the power to adjudicate disputes as to recovery of assets of KHC and KIII.[14] The jurisdiction of this Court to determine this controversy is therefore established.

#### ii. The Facts Before the Court Indicate that the Amounts in Question Were Paid With Assets of the Estate

Section 329(a) of the Code, and Bankruptcy Rule 2016(b) plainly require that an "attorney representing a debtor ... shall file with the court a statement of compensation paid· or agreed to be paid." 11 U.S.C. § 329(a) (Supp. IV 1987). The possible consequences of failure to disclose may include disallowance of fees. *In re Arlan's Department Stores, Inc.,* 615 F.2d 925 (2d Cir.1979) (attorneys for debtor denied compensation, and ordered to return fees paid for failure to disclose retainer until six months after retention); *In re Futuronics Corp.,* 655 F.2d 463 (2d Cir. 1981) (fees disallowed for failure to disclose fee sharing arrangement). Under the applicable rules, the filed statement must also disclose the source of the compensation, even if the source is a third party entity. *In re Chapel Gate Apartments, Ltd.,* 64 B.R. 569, 572 (Bankr.N.D.Tex.1986). It is undisputed that Locke Purnell did not disclose the $500,000.00 retainer it received from the Debtor, KIII, nor did it disclose the arrangements made with KIII for payments made to Locke Purnell for the benefit of the Involuntary Debtors. Therefore, if it is shown that the payments were made with property of the estate, disallowance of fees could provide an appropriate remedy.

Additionally, section 330 of the Code forbids payment to professionals without notice and hearing. The amounts paid by KIII to Locke Purnell on behalf of the Involuntary Debtors were made without notice and hearing. Again, if the amounts paid to Locke Purnell without approval were property of the Debtor estates, then disallowance of the fees is appropriate.

The critical question then is whether the funds used by KIII to pay the retainer to Locke Purnell, and used to pay the legal fees of the Involuntary Debtors, were property of the estate. The· Court holds that regardless of (a) the source of the cash, (b) whether KIII was a zero net income company, or (c) to whom the assets of KIII were owed, the funds were property of the estate. Upon the filing of the involuntary petition, a bankruptcy estate was created, and that estate included the property of the Debtor. *See,* 11 U.S.C. § 541 (1982 & Supp. IV 1987). Those assets included all cash, property, and accounts receivable of the Debtor.

Locke Purnell attempted at hearing to argue that the amounts in KIII's accounts constituted some sort of trust fund for the subsidiary companies. This was based on the fact that KIII was solely a holding company for the KHC subsidiaries. However, Locke Purnell has not shown this Court anything which evidences any intent to create a trust. Therefore, no express trust is shown. *Rosenberg v. Collins,* 624 F.2d 659, 663 (5th Cir.1980). Further, this Court has already made a finding that it was impossible to trace specific funds in the accounts of KIII. Because specific funds are not traceable, an implied trust cannot be shown. *Id.*

The Court has already made a finding that KIII made no allocation of the expenses of Locke Purnell to any of the Involuntary Debtors. This also weighs against any trust theory, or any claim that it was actually the Involuntary Debtors who were paying Locke Purnell's fees.

All that remains is the fact that Locke Purnell received money from KIII, a debtor in bankruptcy. No evidence indicates that these funds were not property of the estate. Therefore, Locke Purnell violated

---

**14.** Article XII, section 12.05 of the Committees' Plan provided for the retention of jurisdiction:
To determine any application, adversary proceeding or contested matter commenced on or after the Confirmation Date involving the collection or liquidation of assets of the Debtors, including, without limitation, any proceeding commenced for the purpose of voiding, recovering or preserving for the benefit of the Estates any transfer of property, obligations incurred by the Debtors lien or set off.

sections 541, 363, 328, 330 of the Code, and Bankruptcy Rule 2016 by receiving an undisclosed post-petition transfer of property of the estate as compensation of a professional.

### CLAIM NUMBER III:

*The Services Provided by Locke Purnell Were of No Benefit to the Estates*

### FINDINGS OF FACT

1. The Debtors' First Amended Plan of Reorganization was filed with the Court on December 5, 1985.

2. Counsel with Locke Purnell admitted that the Plan was "legally flawed," and could only be confirmed with the unanimous vote of all classes.

3. Locke Purnell was aware or should have been aware that the Committees were not going to vote for the Debtors' First Amended Plan, yet they went to the great expense of mailing the plan and having related hearings.

4. The First Amended Plan never obtained votes sufficient to allow it to proceed to confirmation.

5. On February 3, 1986, Locke Purnell filed its Third Amended Plan of Reorganization.

6. After months of hearings on the Third Amended Plan, the Court rejected the Plan by granting the Committees' motion under Federal Rule of Civil Procedure 41(b). Judgment was entered on June 24, 1986, and subsequent findings were entered on August 6, 1986.

7. Among other things, the findings of the Court, in the denial of confirmation, discussed the legal inadequacies of the Debtors' Third Amended Plan. For instance, the Court found that classification of one creditor was an "attempt to create an impaired consenting class, and was not done in good faith."

8. Following rejection of the Debtors' Plan, the Committees' Plan proceeded to confirmation hearings. Locke Purnell vigorously opposed confirmation, despite their view, as expressed to Mr. Ken Davis, that the Committees' Plan was confirmable.

9. On November 24, 1986, the Committees' Plan was confirmed.

10. Also on that date, the Court issued its order denying Locke Purnell's request for a new hearing of the Debtors' Third Amended Plan.

11. On November 24, 1986, Locke Purnell appealed the Court's order confirming the Committees' Plan, and the order denying rehearing on the Debtors' plan.

12. On November 28, 1986, Locke Purnell filed a motion for stay pending appeal with this Court.

13. On December 4, 1986, the Court allowed temporary stay until January 16, 1987.

14. On January 7, 1987, Locke Purnell filed a motion for stay pending appeal with the District Court.

15. On March 26, 1987, the District Court denied stay pending appeal, and issued a memorandum opinion dismissing Locke Purnell's appeal.

16. On March 31, 1987, Locke Purnell filed a motion to vacate the Court's order confirming the committees' plan based on the previous Bankruptcy Judge's alleged conflict of interest. On April 7, 1987, a similar motion was filed with this Court.

17. On April 10, 1987, the District Court denied Locke Purnell's motion to vacate. The motion to vacate was also denied by this Court.

18. On April 10, 1987, Locke Purnell appealed the District Court's order denying motion to vacate. Also on that date, the District Court denied Locke Purnell's motion to stay the District Court's order pending appeal.

19. On September 24, 1987, the United States Court of Appeals for the Fifth Circuit affirmed the District Court's orders denying Locke Purnell's appeals. Among other findings, the Fifth Circuit held that only "one aspect of the appeal [was] not frivolous." *In re Kendavis Holding Company,* No. 87–1251, slip op at 2 (5th Cir. 1987) (per curiam).

20. On November 10, 1987, the Fifth Circuit directed that costs of the appeal be

assessed against old management of KHC, and the Davis stockholders.

21. On December 18, 1987, this Court denied Locke Purnell permission to seek writ of certiorari to the United States Supreme Court.

22. Following implementation of the Committees' plan, Locke Purnell made several motions to this Court, in an apparent attempt to delay or defeat implementation. These motions included:

(i) motion to appoint a trustee,

(ii) motions to prevent dismissal of several involuntary debtors, and

(iii) motions to stop payment to a class of creditors.

All of these motions were overruled.

## CONCLUSIONS OF LAW

The point of all of the above findings is to show that Locke Purnell's efforts in these cases have been remarkably unsuccessful. Their best efforts have been defeated at every turn for nearly three years. For example, their plans were rejected twice and appeals of the confirmation were uniformly denied. This raises the issue of the previously discussed *Johnson* factors regarding Locke Purnell's right to compensation. *Johnson*, 488 F.2d 714. Also to be considered is 11 U.S.C. § 330 (Supp. IV 1987).

Section 330 of the Code allows professionals compensation based partially on "the value of such services." 11 U.S.C. § 330(a)(1) (Supp. IV 1987). Obviously if a service is of little value to the estate that fact should be considered when awarding compensation.

As previously discussed, the Fifth Circuit has instructed that courts consider the *Johnson* factors when making awards of compensation. *First Colonial*, 544 F.2d at 1299. One of the "special heed" *Johnson* factors is "results obtained." *Copper Liquor*, 624 F.2d at 583. In this case, the results obtained by counsel for the Debtor did not benefit the estate. One must wonder whether the battle was to confirm a plan or for some other retribution.

The case law plainly supports a reduction of fees for failure to achieve beneficial results. In *In re Coastal Equities, Inc.*, 39 B.R. 304, 311 (Bankr.S.D.Cal.1984), the court found that counsel for the debtor's fees should be reduced by 50% for failure to achieve a successful plan of reorganization. *Accord, In re Garnas*, 40 B.R. 140, 142 (Bankr.D.N.D.1984).

Therefore, based on the facts of the case, the Court has no choice but to hold that Locke Purnell's fees do not survive one of the special heed *Johnson* factors, that of benefit to the estate. Further, the requirements of section 330 of the Code requiring compensation only for value of services provided have not been met. Reduction of fees is appropriate under this standard.

## VI. DISCUSSION OF THE LAW REGARDING FEE ALLOWANCE TO COUNSEL HOLDING A CONFLICT OF INTEREST

Having reached the conclusion that Locke Purnell had a conflict of interest in its representation of the Debtors, the Court must take appropriate action. In particular, the Court must consider the various cases which suggest methods for dealing with a conflict of interest in a bankruptcy case. The conclusion is that Locke Purnell's fees must be reduced. It might be noted that the discussion in this section of the opinion applies only to a fee reduction for conflicts of interest. Any possible reduction of fees for other claims is considered hereafter.

It has already been noted that the Bankruptcy Code gives the Court the authority to disallow fees where a professional is found to not have been disinterested. 11 U.S.C. section 327 (1982). It has also been shown that the case law supports the result. *See, e.g., In re Chou–Chen Chemicals*, 31 B.R. 842 (Bankr.W.D.Ky.1983). The only question therefore is whether fees are to be disallowed in their entirety, or only in part.

The seminal case regarding conflicts of interest in bankruptcy cases is *Woods v. City National Bank and Trust Co.*, 312

U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941). This case affirmed the decision of a district court which disallowed compensation to an attorney for a Chapter X debtor because the applicants were serving conflicting interests. In *Woods,* the court held that "reasonable" compensation "necessarily implies loyal and disinterested service in the interest of those for whom the claimant purported to act." *Id.* at 268, 61 S.Ct. at 497. A narrow interpretation of this case might indicate that attorney fees should be disallowed in total upon the finding of a conflict. This conclusion is reached from the Supreme Court's frequently cited conclusion that "where an actual conflict of interest exists, no more need be shown in this type of case to support a denial of compensation." *Id.* at 266, 61 S.Ct. at 496.

Other courts do not maintain this strict standard. For example, in *Berner v. Equitable Office Building Corp.,* 175 F.2d 218 (2d Cir.1949), the court held that the penalty for the conflict of interest ought to be in proportion to the gravity of the breach, rather than the entire fee. *Id.,* at 222. *In re Martin,* 817 F.2d 175 (1st Cir. 1987); *In re GHR Energy Corp.,* 60 B.R. 52 (Bankr.S.D.Tex.1985); *In re O'Connor,* 52 B.R. 892 (Bankr.W.D.Okla.1985); *In re Roberts,* 46 B.R. 815 (Bankr.N.D.Ga.1985).

██ Other courts suggest a type of balancing test which would compare the attorneys misconduct with the equities of the case. *Watson Seafood,* 40 B.R. at 440. This case held that "all fees are denied when a conflict is present, but the court should have the ability to deviate from that rule in those cases where the need for attorney discipline is outweighed by the equities of the case." *Id.* Absent a clear pronouncement of another rule in the Fifth Circuit, the rule this Court adopts is that where a conflict of interest is apparent, all fees should be denied unless for exceptional reasons partial compensation should be allowed.

██ In this case, it is the Court's view that it would be inequitable to disallow Locke Purnell's fees in their entirety, because Locke Purnell plainly committed a great deal of time and labor to these cases,

based on the previous Court Orders as to interim compensation and postponement of ascertainment of lack of disinterestedness. The Court therefore finds that by awarding Locke Purnell 50% of the compensation it was previously awarded in these cases, an adequate balance is struck between the attorney discipline and the exceptional equities of this case. This is the Court's order regarding the conflicts issue in the Chapter 11 cases only. Again, the other issues in involuntary cases are treated separately.

## CONCLUSION

The Court has made three overall conclusions:

i. Locke Purnell had a conflict of interest in its representation of the Debtors.

ii. Locke Purnell failed to disclose payment of fees, and wrongfully paid itself a retainer.

iii. The services of Locke Purnell were of questionable benefit to the estates.

The Court has concluded that a 50% reduction in fees is an appropriate response for Locke Purnell's conflicts of interest and the rendition of services of doubtful value. The Court will use this section to make findings on the amount of fees to be allowed, and make some other comments to make the drafting of an order more complete.

Locke Purnell failed to disclose the fact that it had received a retainer from KIII without Court approval, and received further payments from KIII as to services rendered to the Involuntary Debtors, all without Court approval, as required by Bankruptcy Rule 2016(a). In short, Locke Purnell accepted payment of fees from a bankruptcy estate without disclosure, and without Court order. The Court orders a denial of fees in toto as to the funds received from KIII for retainer ($500,000), plus all receipts from KIII on billings (including expenses) pertaining to Involuntary Debtors. The order requires any sums paid by KIII post-petition on behalf of In-

voluntary Debtors or any other non Court approved purpose to be returned to the estate.

This constitutes Findings of Fact and Conclusions of Law as required by Bankruptcy Rule 7052.

ADDENDUM

John—

I told KWD your message about selecting a group to negotiate and he said he wouldn't know who to be on it and didn't feel it was even his place to do so.

Further, he said he certainly wouldn't want them picking ours so he doesn't want a desire to pick theirs its totally inappropriate

Lastly, he said if these banks want a deal they would choose a committee that could deliver a deal otherwise we'll just be wasting more time

Remember his reply to the "threat" yesterday about Chp 7 I hope Barb really gunned at them because that's a perfect answer.

The banks need to decide what they want and stop asking us We know what we want & Barb doing a wonderful job in this courthouse to explicate exactly what we want.

Movants Exhibit 34

As Bart continues to repeat ---
And everyone agrees there is no share-
holder equity - so (we've) got nothing
to loose - The Banks have it all on
the line now - not us ---
 The sooner they understand that
the sooner the process will head in
the right direction. So far, Barts
doing a tremendous job. Costing
the banks a great risk - Costing
Leo Davis zip (zero, NADA.