**In re DN ASSOCIATES d/b/a Atlantic Motor Inn, Debtor.**

**Bankruptcy No. 91–20417.**

United States Bankruptcy Court,
D. Maine.

Aug. 20, 1992.

James D. Poliquin, Norman, Hanson & DeTroy, Portland, Me., for DN Associates.

Robert J. Keach, Verrill & Dana, Portland, Me., for Casco Northern Bank.

Eric J. Uhl, Black, Lambert, Coffin & Rudman, Portland, Me., for Seth Driggen.

Gregory A. Tselikis, Bernstein, Shur, Sawyer & Nelson, Portland, Me., for Laurence and Patricia Kenny.

## MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Bankruptcy Judge.

On April 17, 1992, this court confirmed a plan of reorganization proposed by Casco Northern Bank, N.A. ("Casco"), and Laurence A. and Patricia A. Kenny (the "Kennys"). The Casco/Kenny plan provided an immediate one hundred percent cash dividend to unsecured creditors, satisfied the proponents' claims [1] and eliminated the interests of DN's general partner and limited partners.[2] The plan provides for full payment of all priority claims, including allowed professional fees and expenses.[3]

Before the court are final applications for compensation and for reimbursement of expenses for professionals who rendered services to the debtor during the course of the reorganization, including counsel,[4] appraiser,[5] accountant[6] and financial consultant.[7] By earlier-entered orders, the court authorized the debtor to employ each of the applicants pursuant to 11 U.S.C. § 327(a).[8]

1. Casco held a first mortgage and security interest on DN's real and personal assets. The Kennys held a second mortgage and security interest. Amended Disclosure Statement of Casco Northern Bank, N.A. and Laurence A. Kenny and Patricia A. Kenny, at 4–7.

2. Amended Joint Plan of Casco Northern Bank, N.A., and Laurence A. Kenny and Patricia A. Kenny for the Reorganization of DN Associates (the "Casco/Kenny plan"), Court Doc. No. 172, at 4–5.

3. Casco/Kenny plan at 5.

4. James D. Poliquin, Esq., and the firm of Norman, Hanson & DeTroy of Portland, Maine, seek $55,748.00 in fees and reimbursement of $7,150.15 in expenses for the period September 3, 1991 through May 4, 1992. The applicant has previously been paid $33,406.00 in approved fees and has been reimbursed $1,835.52 in expenses. Amended Final Application of Attorney for Debtor for Allowance of Compensation and Reimbursement of Expenses ("Final Fee Application of Counsel"), Court Doc. No. 207; Order Allowing Interim Compensation of Attorney for Debtor dated November 27, 1991.

5. Leland Buzzell of Buzzell–Plourde Associates seeks $5,700.00 in compensation for appraising the debtors' property and for testifying at valuation hearings. Application for Compensation of Appraiser, Court Doc. No. 184.

6. Paul R. Marshall, CPA, and the firm of Marshall & Libby, seek $6,229.57 in compensation for services rendered during the period November 1, 1991, through April 30, 1992. Amended Final Application for Compensation of Accountant, Court Doc. No. 206.

7. Joseph V. O'Donnell and the Pilot Group seek payment of $17,813.00 in compensation for services and reimbursement of $195.78 for expenses for the period October 10, 1991, to April 27, 1992. The court previously approved and authorized payment of $13,865.93 as interim fees and expenses for the Pilot Group. Application for Final Compensation of Financial Consultant, Court Doc. No. 204.

8. Unless otherwise noted, citations to section numbers throughout this memorandum are to the Bankruptcy Reform Act of 1978 ("Bankruptcy Code"), as amended, 11 U.S.C. § 101 et seq. (1991).

In response to the fee applications, Casco and the Kennys argue that the debtor's professionals were representing, or working to advance, interests "adverse to the estate" and, therefore, that all compensation must be denied. Alternatively, they argue that compensation must be disallowed because the professionals' efforts provided no "benefit" to the estate. For the reasons set forth below, the court concludes that the applicants are entitled to compensation and reimbursement.

### Procedural History

DN, a limited partnership, filed its voluntary Chapter 11 petition on April 19, 1991, in the face of state court foreclosure proceedings initiated by Casco. It filed its first proposed reorganization plan, with disclosure statement, on August 19, 1991, the last day of the 120 day exclusivity period. *See* 11 U.S.C. § 1121(b). Casco and the Kennys objected to the plan and to the disclosure statement. They moved to appoint a trustee and, alternatively, to cut off exclusivity. During hearings on September 5, 1991, Casco and the Kennys represented that they imminently would file a plan providing a 100% payment to unsecured creditors. The court ordered termination of exclusivity so competing plans could be considered in expedient fashion.[9]

DN filed its first amended plan on October 5, 1991. Casco and the Kennys filed their plan on November 25, 1991. DN continued to press its own plan, precipitating hearings to consider the classification and valuation issues it generated.

Following November 25, 1991, DN's plan evolved in response to rulings and developments pertaining to, among other things, its classification scheme, the value of the debtor's assets and the limited partners' ability to retain their interests by making capital contributions to the reorganized entity. By the time the court considered confirming the Casco/Kenny plan, DN was promoting its fourth amended plan and promising a fifth. Because the joint creditor plan was readily confirmable, impaired no claims or interests,[10] provided for immediate, bank-guaranteed payment of unsecured claims; because DN's proposals remained, in a word, fluid; and because confirmation truncated protracted and expensive litigation, the Casco/Kenny plan was confirmed.

### Discussion

Casco and the Kennys argue that, as soon as they proposed a 100% plan, DN was obliged to concede the reorganization and, necessarily, that all its professionals' subsequent efforts favored interests "adverse to the estate," i.e., those of DN's limited partners, management,[11] general partner,[12] and promoter.[13]

In order to determine the applicants' entitlement to compensation, the court must consider whether they lacked "disinterestedness," or actually represented insiders, and thereby acted with an impermissible

---

**9.** Under § 1121(c)(3), if a debtor has filed a plan within the 120 day period set by § 1121(b), it is provided an additional 60 days within which it may attempt to obtain the plan's acceptance while other parties remain precluded from filing competing plans. The court may increase or decrease the 120 and 180 day periods "for cause" on the request of a party-in-interest. 11 U.S.C. § 1121(d). The timing of DN's plan's filing (the 120th day), the unlikely prospects for gaining acceptances by significant creditor interests in the next 60 days, the questionable prospects for its confirmation over creditor objections and the promise of a competing 100% plan established cause for terminating exclusivity on September 13, 1991. *See generally* Lawrence P. King, 5 *Collier on Bankruptcy* ¶ 1121.03 at 1121–12 (15th Ed.1992). *See also In re Grossinger's Assoc.*, 116 B.R. 34, 36 (Bankr.S.D.N.Y.1990) (exclusivity terminated where debtor had not filed plan with "serious reorganizational possibilities").

**10.** Because DN's liabilities exceeded the value of its assets, the limited partners' interests were valueless. Thus, although the Casco/Kenny plan eliminated those interests, they were not impaired within the meaning of 11 U.S.C. § 1124(3)(B).

**11.** E & H Management has managed the hotel since its acquisition by DN.

**12.** Roseman Development Corporation is DN's general partner.

**13.** Mr. Driggin organized DN Associates. He is an owner of both Roseman Development Corporation and E & H Management.

conflict of interest. The court will next consider whether the professionals' efforts conferred a "benefit" to the estate and whether the amounts sought as compensation are reasonable.

### 1. Counsel for DN.

Because the role of debtor's counsel is central, because counsel's actions have drawn the most criticism from Casco and Kenny, because other professionals were retained within the context of DN's counsel-guided reorganization strategy and because counsel's fees and expenses represent far and away the largest portion of fees sought, the court will first analyze the attorney fee application.

a. *Relevant Statutory Sections.* Section 323(a) of the Code states that a trustee in a bankruptcy case "is the representative of the estate." Section 1107(a) of the Code gives a debtor-in-possession the same rights and duties as a trustee.[14] The debtor-in-possession:

> may employ one or more attorneys ... that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a). Counsel for the debtor-in-possession is charged with providing legal services to assist the debtor in fulfilling its duties to the estate.[15] Services rendered are compensable from estate assets.[16] If, during the course of representation, counsel ceases to be disinterested or represents or holds an interest adverse to the estate, the court has discretion to reduce or to deny compensation:

> Except as provided in section[s] 327(c), 327(e), or 1107(b) of this title, the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is *not a disinterested person, or represents* or holds *an interest adverse* to the interest of the estate with respect to the matter on which such professional person is employed.

11 U.S.C. § 328(c) (emphasis added).[17] *See In re M–H Group, Inc.,* 139 B.R. 836 (Bankr.N.D.Ohio 1991) (court retains discretion regarding fees under § 328(c)); *In re EWC, Inc.,* 138 B.R. 276, 282 (Bankr. W.D.Okl.1992) (§ 328(c) provides discretion regarding compensation where disinterested professional subsequently comes into conflict). Even when a *conflict is* demonstrated, the court may award fees. *See e.g., In re Kendavis Industries Int'l, Inc.,* 91 B.R. 742, 761 (Bankr.N.D.Tex.1988) (awarding 50% of fees sought).

---

**14.** Section 1107(a) provides, with certain exceptions not pertinent here, that "a debtor-in-possession shall have all the rights ... and powers, and shall perform all the functions and duties ... of a trustee serving in a case under this Chapter."

**15.** *See* 11 U.S.C. §§ 1107(a), 1106(a) and 704.

**16.** Section 330(a)(1) of the Code provides, in pertinent part:

> § 330 Compensation of Officers.
> (a) [T]he court may award ... to the debtor's attorney—
> (1) reasonable compensation for actual, necessary services ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under ... [title 11]; and ...

**17.** *See* 11 U.S.C. § 101(14), which provides that: "disinterested person" means person that—

> (A) is not a creditor, an equity security holder, or an insider;
> (B) is not and was not an investment banker for any outstanding security of the debtor;
> (C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the debtor;
> (D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; and
> (E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason;

Thus, the court must scrutinize counsel's actions to ascertain whether, having been retained to represent the debtor, he or she ceased to be disinterested or represented parties holding interests adverse to the estate. *See In re Kendavis Industries Int'l, Inc.,* 91 B.R. at 748; *In re Chou-Chen Chemicals, Inc.,* 31 B.R. 842 (Bankr. W.D.Ky.1983).

b. *Representing the Debtor: Fiduciary Duties and Conflicts of Interest.*

■ Without question, the Chapter 11 debtor and its management occupy a fiduciary role vis-a-vis the estate and its constituents. *In re Freedom Solar Center, Inc.,* 776 F.2d 14 (1st Cir.1985); *In re Office Products of Am., Inc.,* 136 B.R. 983, 986 (Bankr.W.D.Tex.1992); *In re Chapel Gate Apartments, Ltd.,* 64 B.R. 569, 576 (Bankr. N.D.Tex.1986). *See Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 1994, 85 L.Ed.2d 372 (1985); *Wolf v. Weinstein,* 372 U.S. 633, 649, 83 S.Ct. 969, 979, 10 L.Ed.2d 33 (1963). That role requires them to refrain from activities aimed to benefit only themselves. *See In re Wilde Horse Enterprises, Inc.,* 136 B.R. 830, 840 (Bankr.C.D.Cal. 1991); *In re Kendavis Industries Int'l, Inc.,* 91 B.R. at 752. Counsel may not assist in such efforts, on pain of losing the right to compensation. *In re Wilde Horse Enterprises, Inc.,* 136 B.R. at 840–43. "A debtor-in-possession's attorney cannot be compensated for representing the interest of the debtor or the debtor's directors, officers and/or shareholders in a manner which is adverse to, or does not benefit, the estate or the creditors." *In re Office Products of Am., Inc.,* 136 B.R. at 989. *See In re Freedom Solar Center, Inc.,* 776 F.2d at 16–17 (Chapter 7 case discussing interests of debtor and its principal and holding that when their interests diverge counsel may not represent both). *See also In re Chapel Gate Apartments, Ltd.,* 64 B.R. at 576.[18]

■ Although DN's limited partners, its general partner and its management appeared through separate counsel throughout the case, Casco and the Kennys argue that, in promoting DN's proposals for reorganization, and shunning the creditor plan, DN's counsel represented interests "adverse to the estate." Therefore, they urge that compensation for such services be denied.[19]

Casco and the Kennys ask the court to infer that counsel's activities were impermissibly intended to benefit DN's insiders because continuing to prosecute DN's plan after the Casco/Kenny plan was filed would "only" benefit them, not the creditors. Granted, differences in the competing plans can be found principally in DN's objectives to retain control of its assets, to keep existing management and, with infusions of new capital, to maintain the interests of limited partners. However, DN's

**18.** One area in which there remains doubt as to the compensability of services rendered solely for the debtor's benefit is that of defending objections to discharge or dischargeability of particular obligations. Most courts hold that fees and expenses incurred in defending such actions are not compensable. *See In re Latham,* 131 B.R. 238, 239 (Bankr.S.D.Fla.1991); *In re Lilliston,* 127 B.R. 119, 122 (Bankr.D.Md.1991); *In re Reed,* 95 B.R. 626 (Bankr.E.D.Ark.1988), *later proceeding* 890 F.2d 104 (8th Cir.1989). The minority view, historically followed by courts in this district, is to the contrary. *See In re Deihl,* 80 B.R. 1 (Bankr.D.Me.1987); *In re Gray,* 7 C.B.C. 571 (Bankr.D.Me.1975). Discussions regarding the compensability of such services implicate the Code's "fresh start" policy for individual debtors and, therefore, are inapposite to the issues in this case.

**19.** Casco and the Kennys' principal criticism is based on the contention that the prospect of a creditor-backed plan calling for bank-guaranteed 100% payment to unsecured creditors necessitated that DN, as a fiduciary to the estate, cease pressing its own reorganization proposal. They assert that their promise to file such a plan came "early in the case" and, therefore, that DN and its professionals have been operating at cross-purposes to the estate virtually from the outset. Thus, they argue that DN's entire reorganization effort should be considered as though undertaken in the face of a competing 100% creditor-backed plan. At least until the Casco/Kenny plan was filed, however, DN was obliged to formulate and to pursue confirmation of a reorganization plan. *See* 11 U.S.C. §§ 1106(a)(5), 1107. Under the circumstances of this case, it is not appropriate to consider that DN broke faith with its obligations to the estate by refusing to accede to the Casco/Kenny plan any earlier than November 25, 1991, when the plan was filed.

plan sought to achieve none of these results by denying creditors their due. DN proposed that unsecured creditors be paid in full shortly after confirmation; that Casco retain its collateral and be paid its secured claim; and that administrative claims be fully paid.

Although there were substantial hurdles to confirmation of DN's plan, in none of its multiple incarnations did it aim to benefit insiders and equity *at the expense of* the creditor body. DN's course was consistent with its fiduciary duties to *all* of the estate's constituencies. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. at 355, 105 S.Ct. at 1994 (under the Code, debtor's management bears same fiduciary obligations to "creditors and shareholders" as would a trustee for a debtor out of possession); *In re Office Products of Am., Inc.*, 136 B.R. at 986; *In re Kendavis Industries Int'l, Inc.*, 91 B.R. at 747 n. 1 (discussion of legislative history of "disinterestedness" requirement which reflects concern for "investors and the public"). *See generally* Richard L. Epling and Claudia G. Sayre, *Employment of Attorneys by Debtors in Possession*, 47 The Business Lawyer 671, 678–79 (1992) (discussing history of Chapter 11 including legislative concern for protection of investors).[20]

This is not a case like *In re Kendavis Industries Int'l, Inc.*, 91 B.R. at 749–51, in which the court found, on the basis of the firm's conduct and documentary evidence, that debtor's counsel represented both the debtor and the debtor's owners in circumstances where their respective interests were opposed. The same factors distinguish *In re Wilde Horse Enterprises, Inc.*, where the court found that the Chapter 11 debtor's counsel represented undisclosed adverse interests. 136 B.R. at 846. *In re Storms*, 101 B.R. 645 (Bankr.S.D.Cal.1989), another case upon which Casco and the Kennys rely, is also readily distinguishable.

In *Storms*, the Chapter 11 debtor was an individual engaged in an ongoing dispute with his ex-spouse. His efforts in opposing the plan she proffered were aimed to secure only his personal advantage.

This is a case more closely akin to *In re Office Products of Am., Inc.*, 136 B.R. at 983. In *Office Products*, the court considered the debtor's counsel's application for compensation in the face of creditor objections alleging that counsel, by filing and promoting a reorganization plan which elevated officers' and directors' interests over those of creditors and which could be confirmed, if at all, only through a § 1129(b) cram down, represented interests adverse to the estate, thereby forfeiting their right to compensation. In *Office Products*, there was no direct evidence of a conflict, and the court, noting the Code's provisions favoring a debtor's attempts to reorganize, declined to find that a conflict existed. 136 B.R. at 988. It did, however, consider whether counsel's efforts were beneficial to the estate.[21]

DN's reorganization efforts were attempts to harmonize the interests of all the estate's constituent elements, including creditors and interest holders. Such attempts are consistent with the debtor's fiduciary obligations, which extend to the entire community of interests affected by reorganization, including investors. It would be unfortunate if courts, looking only at plan provisions removed from context, concluded as a matter of law that a conflict of interest existed whenever a debtor and its counsel, in the face of creditor opposition, pursued a reorganization strategy that, while providing for creditors in a fashion consistent with Chapter 11's priorities, sought to adjust the rights and relations of parties-in-interest so that the interests of equity interest holders could be preserved. This court declines the invitation to do so.[22]

**20.** *See e.g.,* 11 U.S.C. §§ 1102(a)(1) (providing for appointment of equity security holders' committee); 1103 (powers and duties of committees); 1109(b) (right to be heard); 1129(c) (factors to be considered in a confirmation of competing plans).

**21.** *See* discussion *infra*, text at n. 28.

**22.** In *Office Products,* a case in which the plan proposed by the debtor, unlike DN's proposals, clearly failed to strike a fair balance between owners and creditors, Judge Clark nevertheless

DN's counsel remained disinterested and did not represent interests adverse to the estate.

c. *Benefit to the Estate: Success, Lodestar and the Futility Factor.*

Casco and the Kennys argue that, whether or not DN's counsel clears other hurdles, fees must be heavily discounted because counsel provided no benefit to the estate. "Benefit to the estate" is unquestionably a pertinent factor in evaluating professionals' fee applications.[23]

■ In this circuit, bankruptcy fee applications are evaluated under the lodestar approach. *In re Spillane*, 884 F.2d 642, 647 (1st Cir.1989); *Boston & Maine Corp. v. Moore*, 776 F.2d 2 (1st Cir.1985); *In re Casco Bay Lines, Inc.*, 25 B.R. at 755. *See*

refused to find that the debtor's attorneys' had a conflict of interest or lacked disinterestedness:

> The trustee would have this court hold that, in essence, proposing such a [cram down] plan necessarily created a conflict of interest, and debtor's counsel, by advancing that plan in the face of creditor opposition, developed a conflict of interest, justifying their disqualification under § 327(a) and a concomitant disallowance of their fees under § 328(c).
>
> There are serious policy ramifications to such a holding, however, which auger against deciding the case on that basis. The cram down provisions of the Code are an expression of congressional intent regarding the importance of reorganization values even in the face of considerable creditor opposition, provided those creditors' interests are appropriately protected. H.Rep. No. 595, 95th Cong., 1st Sess. 220–21, 416–18 (1977). Were we to hold here that pursuing those goals over the objections of creditors in and of itself created a conflict of interest, lawyers would be discouraged from even representing debtors in the face of creditor opposition (even if the plan could pass muster under § 1129(b)), for fear of not being paid.

136 B.R. at 986.

23. 11 U.S.C. § 330, *supra* n. 16. *See In re Casco Bay Lines*, 25 B.R. 747, 756 (Bankr. 1st Cir. 1982).

24. Rather than attempting to grade in the net benefit or results of the reorganization proceeding by making corresponding fine adjustments in the number of hours spent on each and every task undertaken by counsel, we suggest the bankruptcy judge should reserve such an adjustment until the lodestar is determined. In this way the objectivity of the lodestar can at least in some way be pre-

*also In re Saturley*, 131 B.R. 509 (Bankr. D.Me.1991). It is appropriate first to consider the time expended and the rates charged to arrive at the lodestar fee, before proceeding to adjust the fee upward or downward in light of the net benefit provided or the results achieved.[24]

■ It is unnecessary to parse the application here. No party seriously contends that the applicants' hourly rates[25] were unreasonably high or that too much time was spent on any of the tasks counsel undertook.[26] The court's independent review of the detailed statement of services provided confirms that the $55,748.00 in fees sought, and the $7,150.15 expenses for which reimbursement has been requested, are reasonable.[27]

> served. Of course, hours spent on matters beyond that consistent with a standard of reasonable efficiency and productivity should be stricken from the lodestar calculation, but such an approach ideally should be tempered with a view towards the need for the services at the time they were rendered.
>
> *In re Casco Bay Lines, Inc.*, 25 B.R. at 756 (citations omitted).

25. The attorneys' rates range from $90.00 per hour for experienced associates to $125.00 per hour for partners with bankruptcy and litigation expertise.

26. At hearings, Casco and the Kennys raised some questions about the necessity of undertaking certain tasks described in the services itemization included in the application. The applicant provided full and satisfactory explanations.

27. Counsel expended 499.0 hours working for DN during the eight-month period covered by the final application. Work included: successful defense of an earlier-rendered cash collateral decision on appeal, *In re Majestic Motel Assoc.*, 131 B.R. 523 (Bankr.D.Me.1991) *aff'd Casco Northern Bank v. Majestic Motel Assoc.*, U.S. District Court Docket No. 91–0247–B; drafting disclosure statements and plans; and trying valuation issues. Plan preparation required analysis of whether Casco's and the Kennys' undersecured claims could be classified separately from those of general unsecured creditors, whether an adequate protection stipulation between DN and an equipment vendor rendered the vendor's claim impaired and whether unsecured creditors' claims were impaired by a brief post-confirmation delay in payment. Valuation hearings were extensive and involved the testimony of seven expert witnesses over four days of trial.

■ Casco and the Kennys urge, once again, that all counsels' efforts were aimed to benefit parties other than creditors and, therefore, that those efforts could not, and did not, benefit the estate. These concerns have been answered above. They also argue that, even if counsel's efforts are not faulted for their motive or their master, the debtor's evolving reorganization plan fell so far short of confirmation standards that continuing to prosecute it in the face of the Casco/Kenny plan was a waste of time.

■ Counsel is charged with a "duty of diligence" and should be expected in every reorganization to make a "seasoned determination" whether the debtor is capable of achieving successful reorganization. *In re Amstar Ambulance Service, Inc.*, 120 B.R. 391, 396 (Bankr.N.D.W.Va.1990). Attorneys will not be compensated for vain attempts to resuscitate the debtor long after they should have given up the ghost.[28]

■ At the same time, counsel need not always be unqualifiedly successful to warrant an award of fees. The court "should not penalize an applicant solely because the efforts were not ultimately successful." *In re The Gibbons–Grable Co.*, 141 B.R. 614 (Bankr.N.D.Ohio 1992). Efforts that result in utter failure may be compensated when they are undertaken in good faith, based upon an objectively reasonable expectation of success and diligently performed. *Id.*

■ The result obtained is an important factor in gauging the quality of representation provided and the benefit of counsel's service to the estate. An across the board percentage reduction of fees may be imposed for failure to achieve beneficial results. As noted in *Casco Bay Lines,* "[i]t is under the heading 'quality of representation' that a bankruptcy court should particularly consider the results of the attorney's participation in the bankruptcy proceeding,

and the benefit to the estate to see if circumstances warrant adjustment of the lodestar figure." 25 B.R. at 756.

In *Kendavis,* the court found that the debtor's attorney, working with a conflict of interest, expended a great deal of energy on unproductive plan confirmation contests, including a frivolous appeal of the creditors' committee's plan's confirmation. A 50% fee reduction was imposed "for failure to achieve beneficial results." *In re Kendavis Industries Int'l, Inc.*, 91 B.R. at 761. Other courts have imposed percentage fee reductions when debtor's attorneys' activities did not benefit the estate. *See In re Saunders,* 124 B.R. 234, 238 (Bankr.W.D.Tex.1991) (20% fee reduction imposed where court found efforts of firm to be of questionable effect in reducing claims, restructuring secured debt or effectively recovering preferences); *In re Garnas,* 40 B.R. 140, 142 (Bankr.D.N.D.1984) (50% reduction ordered where counsel's diligent efforts were expended when a successful reorganization was unlikely); *In re Coastal Equities, Inc.*, 39 B.R. 304, 311 (Bankr.S.D.Cal.1984) (debtor's counsel's fees reduced by 50% for failure to confirm a plan of reorganization). *See also In re Office Products of Am., Inc.*, 136 B.R. at 990–91 (disallowing fees attributable to work opposing reconversion to Chapter 7 by proffering an unconfirmable plan).

■ When efforts to confirm a plan are unsuccessful, it is useful to consider the proposed plan's vitality under § 1129(a) in assaying the worth of the plan proponent's counsels' services, by testing:

whether the proposed plan would have met even the standards of 1129(a), which is the *sine qua non* for confirmation of *any* plan, regardless of creditor opposition. *See* 11 U.S.C. § 1129(a) (court may confirm a plan *only if* all requirements of the section are met). This section spells out the *minimums for a plan that*

---

**28.** The court does not agree with the applicants' argument that, because there is a confirmed plan in place under which it is Casco's obligation to pay allowed administrative claims, standards governing compensation by the estate do not pertain. The applicants have never been relieved from their obligation of fidelity to the debtor-in-possession. The context of Casco's plan obligation to pay administrative fees is the context the Code provides, which authorizes compensation for "necessary and reasonable" expenses and fees based on, among other things, the value of those services.

represents a legitimate effort at reorganization, that operates in the best interests of the estate and its creditors. If it does not, then we are right to ask whether any benefit has been conferred on the estate in pursuing the plan in the first place, *if* it is clear from the context of the case that the debtor and its counsel knew or should have known from the outset that the plan could *not* satisfy the requisites of § 1129(a).

*In re Office Products*, 136 B.R. at 990. (Emphasis in original.)

Casco argues that DN's plan proposals "placed the entire risk of non-payment and failure of the plan on creditors, secured and unsecured"[29] and that counsel "knew, or should have known, from the outset that the Debtor's proposed plans could not satisfy the requirements of § 1129(a), particularly in light of the opposition of Casco and the Kennys and the announcement of the Casco/Kenny plan."[30] Casco also contends that DN's counsel spent "considerable time" opposing the Casco/Kenny plan, notwithstanding its promise of 100% payment to unsecured creditors.[31] The argument is, in significant respects, overstated.[32]

Although even in the absence of the competing Casco/Kenny plan, DN's ability to satisfy the requirements of § 1129(a) was far from certain, it was never foreclosed.

The only exception is § 1129(a)(8), calling for acceptance by, or non-impairment of, each class of claims or interests. Because cram down under § 1129(b) is an option Congress provided for Chapter 11 debtors, creditor opposition should not be considered in assessing a proposed plan's compliance with § 1129(a) for purposes of determining whether prosecuting the plan provides a benefit to the estate. *In re Office Products of Am., Inc.*, 136 B.R. at 990.[33]

Moreover, DN's persistent push for its plan spurred Casco and the Kennys to file and press forward their own plan, ultimately resulting in a confirmed plan that paid trade creditors in full.[34]

Throughout this proceeding DN worked toward confirmation of a plan that, in addition to paying creditors, left the interests of limited partners as undisturbed as possible. Although it was less than certain, its plan arguably did, or could, satisfy all requirements of § 1129(a), save one—acceptance by impaired classes of creditors.[35] Though ultimately unsuccessful, DN's attorney's efforts to present a cram down plan by arguing that it, rather than the Casco/Kenny plan, should prevail under a § 1129(c) "competing plans" analysis were part of a constructive effort aimed to obtain a confirmed plan for this debtor. Although a plan was confirmed, DN was un-

---

**29.** Memorandum of Law in Support of Objection of Casco Northern Bank, N.A. to Debtor's Attorney's Amended Application for Allowance of Compensation and Reimbursement of Expenses, Court Doc. No. 214, at 16.

**30.** *Id.* at 13.

**31.** *Id.*

**32.** DN's plan always provided for full payment of unsecured creditors shortly after confirmation, posing little risk for them. It was only Casco and the Kennys, and later only Casco, whose fate was dependent on the success of future operations. To the extent they faced such risks, however, the plan treated their claims as fully secured. Moreover, the record reveals that DN's attorneys spent very little time objecting to the Casco/Kenny plan. Counsel merely tried, valiantly but in vain, to keep the door open for consideration of DN's promised final plan revision so that it could be compared to the Casco/Kenny plan under § 1129(c).

**33.** *See* discussion *supra* at n. 22. The fact that there was a competing plan on file does not alter the analysis appreciably. The relative pros and cons of competing potentially confirmable plans are to be considered pursuant to § 1129(c). That there was a competing plan against which DN's proposal might ultimately be measured does not render DN's counsel's efforts valueless.

**34.** Granted, such a prod to Casco and the Kennys could have been provided in other, more direct ways, but at the expense of DN's continuing effort to provide for all classes of claims and interests. *See* discussion *supra*.

**35.** The plan did raise serious questions regarding, among other things, classification, valuation and feasibility. Such issues ultimately went unresolved.

successful in seeing that the plan was its own.

Under these circumstances, the court will not impose a percentage fee reduction. The case was hard fought. DN lost. But its efforts, through counsel, were neither quixotic nor unreasonably battlesome. Chapter 11 provides an avenue to consensual reorganization. Absent consent, the adversary process is the path to resolution. DN's counsel contributed constructively to the resolution of this case by representing the debtor zealously, but always in reasonable, competent and ethical fashion. The fees will be allowed in full.

### 2. *Other Professionals.*

Casco and the Kennys take no issue with either the nature of services performed or the rates charged by other professionals who served DN. Rather, their objection remains that these professionals served the wrong master in DN's overall reorganization strategy. Having reviewed the applications in detail, and having previously answered the complaining parties' concerns, the remaining applications for compensation will be allowed in full.

### *Conclusion*

DN's attorneys rendered reasonable and necessary services. Their application for compensation, as well as the applications of DN's accountants, appraiser and financial consultant will be approved in accordance with the foregoing discussion.

This memorandum constitutes the court's findings of fact and conclusions of law pursuant to F.R.Bankr. P. 7052. A separate order will issue forthwith.

### ORDER

For the reasons set forth in the Memorandum of Decision of even date, it is

ORDERED that James D. Poliquin, Esq., and the firm of Norman, Hanson & DeTroy of Portland, Maine, be awarded $55,748.00 in fees and reimbursement of $7,150.15 in expenses,

ORDERED that Leland Buzzell of Buzzell–Plourde Associates be awarded $5,700.00 in compensation,

ORDERED that Paul R. Marshall, CPA, and the firm of Marshall & Libby, be awarded $6,229.57 in compensation, and

ORDERED that Joseph V. O'Donnell and the Pilot Group be awarded payment of $17,813.00 in compensation for services and reimbursement of $195.78 for expenses.