In re ENTERTAINMENT, INC., Debtor.

Bankruptcy No. 96 B 22240.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Sept. 29, 1998.

Laurence Kallen & Chester Foster, Foster & Kallen, Howard Cohen & Scott Schreiber, Much Shelist, Marc Smith, Smith & Herzog, Chicago, IL, for Movant.

Paula Jacobi, Schwartz Cooper, Marc Lipinski, Griffin Hoeffler, Chicago, IL, for Respondent.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON FEE APPLICATION OF DEBTOR'S COUNSEL

JACK B. SCHMETTERER, Bankruptcy Judge.

On August 23, 1996, Debtor Entertainment, Inc. ("Debtor") filed this bankruptcy proceeding under Chapter 11 of the Bankruptcy Code, Title 11 U.S.C. After many disputes punctuated by fights between divided ownership, a Plan was confirmed. Under the Plan, Blazer Builders, Inc. ("Blazer") and Michaels Consulting Inc. ("Michaels") undertook payment of bankruptcy administrative claims together with the Debtor (collectively the "Objectors"), and now they object to most of the fees sought by Debtor's counsel, Laurence H. Kallen ("Kallen"), in his pending Second and Third Fee Applications.

Following evidentiary hearing, the parties rested. The Court now makes and enters the following Findings of Fact and Conclusions of Law.

Kallen faced a most difficult problem: Representation of a debtor in bankruptcy wherein the directors and stockholders were divided by disagreement and conflicting interests. For a time, he tried to steer a middle course that would allow each faction to present its interests in separate plans of reorganization. But after a point, the dispute rendered Kallen's position hopeless, with almost anything he attempted from then on serving only one of the conflicting interests. After that point, he became in conflict and unable to perform in any way to serve the collective interests, and his right to payment for his work thereafter became problematic. Apart from that, some of his earlier work is questionable.

## FINDINGS OF FACT

### Background

1. Debtor owns and operates what our society with some irony chooses to call a "gentlemen's club." On August 20, 1996, Kallen was contacted by Howard Cohen, an attorney for Michael and Deborah Imundo and Terrence Finnigan, who advised him that the Debtor was under imminent threat from its landlord of being evicted from its premises and was not paying its debts as they matured. Kallen was also advised that shareholders of the Debtor were Michael Michals, Deborah Imundo, and Terrence Finnigan; that Michals, Finnigan, and Michael Imundo (collectively "principals of the Debtor") constituted the board of directors of the Debtor; that Finnigan was the president of the Debtor and Michals was the vice-president of the Debtor.

2. On August 23, 1996, Kallen attended a meeting of the board of directors attended by Imundo and Finnigan during which these two directors authorized the Debtor to file a Chapter 11 petition. Kallen was retained as bankruptcy attorney for the Debtor, and he proceeded to file the petition that day. No objection to the filing of the Chapter 11 petition was ever filed by anyone.

3. Without any objection and on due notice to the principals of the Debtor, Kallen was approved by the Court on August 27, 1996, as attorney for the Debtor. At all times mentioned in the Second and Third Applications, Kallen continued to be employed to represent the Debtor and was the attorney of record for the Debtor. He generally maintained communication with all of Debtor's principals and their designated personal attorneys.

4. At no time was Kallen ever employed to represent, been the attorney of record, or acted as the attorney for Michals, Deborah or Michael Imundo, or Terrence Finnigan, or any known creditor or other party in interest to the Debtor.

5. Since filing of the Chapter 11 case, Michals has been represented by counsel (initially by Ronald Rosenblum, then for most of this case by Marc Smith), who received service of court papers and attended many court sessions in this case.

6. Since filing of the Chapter 11 case until January 27, 1998, Finnigan and the Imundos were represented by Howard Cohen, and Cohen received service of court papers and attended some court sessions herein.

7. Pursuant to settlement between Debtor's factions in February 1998, Finnigan and the Imundos severed all connections with the Debtor. Michals now controls the Debtor, and Smith is now the attorney of record for Debtor.

8. At no time during the Chapter 11 case did any director of Debtor request, either formally or informally, that a directors' meeting be called, nor did any stockholder of the company request, either formally or informally, that a shareholders' meeting be called. Accordingly, all directors and shareholders acquiesced in the bankruptcy filing by Debtor and in its continued operation as a debtor-in-possession.

### Pre–Bankruptcy Shareholder Dispute and Factions

9. Prior to June 1996, a dispute had arisen between Michael Michals ("Michals"), Terrence Finnigan ("Finnigan"), and Michael

Imundo ("Imundo") concerning Michals' management of Debtor and over desire of the others to remove him from the Debtor's business.

10. Michals then owned 63⅞% of the outstanding stock of Debtor; Finnigan owned 30½% of such stock; and Imundo's wife Deborah claimed to own 6% of the stock (as to which her ownership is disputed).

11. Imundo was never involved in day-to-day operation of Debtor. Finnigan walked out from Debtor's operations in April of 1996 to take a job that paid him more money, leaving Michals in charge of day-to-day operations.

12. In June 1996, Imundo offered to buy out Michals' stock interest in Debtor, but Michals did not agree to sell.

13. Thereafter, Imundo asked Michals to buy the stock owned by Deborah Imundo and Finnigan, but Michals chose not to do so.

14. In August of 1996, Imundo hired Howard Cohen ("Cohen"), an attorney, to represent him in connection with his unresolved negotiations with Michals.

15. Debtor's Articles of Incorporation and Bylaws allowed for only two directors. Prior to August 1996, Finnigan and Michals were those two directors. Cohen persuaded Finnigan to call a shareholder meeting at which Imundo had a proxy from his wife to vote to amend Debtor's Articles of Incorporation and Bylaws to allow for three directors and also to vote for Imundo as a new director of Debtor.

16. At the shareholder meeting, Michals contested Deborah Imundo's right to vote because she was not a shareholder of record and a certain agreement pursuant to which she was asserted to have purchased her stock did not contain any provision granting her voting rights.

17. Michals opposed any amendment to Debtor's Articles or Bylaws and Imundo becoming a director, and no vote was ever taken at the shareholder meeting.

18. Not surprisingly, the dispute between principals impaired operational leadership, and the business suffered. Shortly after the shareholder meeting, Debtor's landlord commenced a forcible detainer action because of asserted non-payment of rent. That action jeopardized Debtor's option under its lease to buy its premises and indeed jeopardized the entire business.

19. Cohen advised Imundo that he should hire Laurence Kallen ("Kallen") to file a Chapter 11 bankruptcy for the Debtor.

20. Cohen and some of his partners had earlier referred bankruptcy work to Kallen from time to time. In the prior several years, Cohen had sent Kallen five or six bankruptcy cases.

21. Kallen met with Imundo to discuss being hired to represent the Debtor in bankruptcy. Imundo advised Kallen in writing and orally that his goal was to gain control of Debtor and to eliminate Michals as a shareholder.

22. Imundo asked Kallen how he would be paid. Kallen told him that Debtor's counsel could get paid through the bankruptcy reorganization. From that, Imundo knew he would share in the cost of Kallen's bankruptcy advice, since the Debtor would be paying Kallen under some confirmed bankruptcy plan.

23. Before the bankruptcy filing, Kallen advised Imundo and Finnigan that they "had a choice to make as to who would be in charge of the club while the bankruptcy was going on...." Imundo decided to let Michals continue to have operational control and bankruptcy responsibility, while he and Finnigan would oversee operations and prepare a reorganization plan. Kallen suggested to Imundo that he did not have to be operating Debtor to pursue his goal of gaining control of over Debtor, and that he could at a later date seek to claim management control. Indeed, Kallen's view was that differences between the parties could be managed in favor of a course of action that would serve their common interests.

24. None of the foregoing communications between Imundo and Kallen were part of an attorney-client relationship, and Imundo's intent toward Michals and the Debtor were not hidden from Michals. Indeed, at all times after he was retained, Kallen sought to keep Michals fully informed and was avail-

able and did discuss Michals' wishes for his future in the Debtor.

### Bankruptcy Filing and Initial Disclosures

25. When Kallen filed a Chapter 11 petition for Debtor, it included an equity disclosure showing Michals with 63⅔%, Finnigan with 30½%, and Deborah with 6% of the stock of Debtor.

### Adversary Filed to Determine Shareholder Dispute

26. Shortly after Debtor's Chapter 11 was filed, Imundo and Finnigan had Cohen file an adversary proceeding against Michals, case number 96 A 1341 (the "Adversary"). The purpose of the suit was to gain control of Debtor's company, and it sought to take control of the company from Mike Michals by resolving issues as to stock ownership.

27. Kallen did not work on that suit, but then believed that issues over stock ownership had to be resolved before Debtor could move forward, and he expected that questions as to who had voting rights and control of Debtor would be determined in the Adversary.

28. However, after filing of the Adversary proceeding, not much work was done on it. It was costly, and Imundo did not want to pay for Cohen's legal work. Imundo told Cohen that he would have to do legal work on the Adversary without pay at that time, so Cohen did not press the case.

29. Since the Adversary was not moving forward, Kallen told Imundo that issues over stock ownership could be resolved through confirmation of a reorganization plan in bankruptcy.

### Kallen's Knowledge of Need for Board Approval of Debtor's Actions and Lack Thereof

30. When the bankruptcy petition was filed, Kallen knew that Debtor's Board of Directors had to give prior approval for any action by Debtor not within its day-to-day operations, such as filing a plan of reorganization, making large capital expenditures, or taking any action affecting Debtor's lease for its premises. This need was particularly critical since the directors had divided interests.

31. However, at no time during the Chapter 11 was there any meeting of Debtor's Board of Directors, nor were any unanimous consents of directors ever executed to give Debtor authority to take any action.

32. Kallen told Cohen, Imundo, and Finnigan they should call a meeting of Debtor's Board of Directors so Debtor could approve Kallen's pursuit of a Plan of Reorganization, but no such meeting was ever called, and none of the steps taken by Kallen were ever approved formally by the directors. However, his activities were open and disclosed at all times to all of the principals.

### Kallen's Actions to Prevent the Sale of Monarch's Property

33. In January 1996, PCI, Inc. ("PCI") made an offer to Monarch to purchase its real estate on which Debtor operated (the "Property"). PCI advised Michals that, if it bought the Property, PCI would substantially lower Debtor's rent, but the Debtor would retain its purchase option.

34. Kallen asked Imundo and Finnigan what they wanted him to do about the impending PCI sale, and Imundo told Kallen to "use whatever efforts might be at his disposal to block the sale" of the Property. Imundo apprehended that a purchase by PCI might interfere in some way with his interests in obtaining future control over Debtor.

35. The property owner and landlord Monarch did not want to sell to PCI, but to prevent any possible sale, Kallen filed a suit to enjoin the sale. Kallen has sought to justify this action by claiming that the PCI purchase would have been "an end run around the ownership dispute and a destruction of the status quo." Kallen decided he wanted to "maintain the status quo in a very delicate situation." However, this suit was not authorized by the Debtor's Board of Directors or Michals, and it primarily served the interests of one faction in the Debtor.

36. Kallen sought to prevent the sale even though Michals and his personal attorney repeatedly objected to his taking any action that would jeopardize the possible sale and reduction of Debtor's rent. Kallen was repeatedly warned by them that such action

was detrimental to the Debtor. In the end, the suit was not actually pursued and played no apparent role in Monarch's desire not to sell. Apart from serving the interest of only one faction in the company, however, this suit was in no way useful to the Debtor or of value to it. Kallen's ill-advised work on the lawsuit will not be compensated.

### The Debtor's Plan of Reorganization

37. Through January 1997, Kallen conferred with all principals of the Debtor and their counsel on a number of occasions to advise them of bankruptcy plan procedures, requirements, and possible terms. During December 1996 and January 1997, Debtor was under pressure from Bankruptcy Judge Sonderby (to whom the case was then assigned) to file a plan of reorganization. Recognizing that factionalism within the Debtor might hinder or prevent the Debtor from producing a timely plan, and so as not to risk liquidation for failure to produce a plan, in mid-January Kallen began to prepare two plans of reorganization, each to be sponsored by one of the factions. So as not to diminish either faction in the eyes of the Court or the creditors, one plan was to be denominated as the "Debtor's Plan Sponsored by Michael J. Michals," and the other plan was to be denominated as the "Debtor's Plan Sponsored by Terrence K. Finnigan and Michael and Deborah Imundo." Each faction knew that Kallen was thereby cooperating with the other to prepare the two possible plans. At no time until January 27, 1997, did any principal object to that procedure.

38. On January 27, 1997, Michals (through Smith) advised Kallen that he would not go ahead with the possible Debtor's plan to be filed in his name, and he also directed Kallen not to go ahead with the Debtor's plan sponsored by Finnigan and the Imundos. Kallen disputed Michals' reasoning and also questioned the workability of provisions that Michals wanted in a plan. Whether Michals or Kallen were right or wrong need not be resolved here; it is the dispute and conflict that mandated Kallen's obligation under authority cited in the Conclusions of Law herein below to steer clear of representing one faction against another. However, since the Debtor was facing a deadline to file a plan by January 28, 1997, Kallen felt that it would harm the best interests of the Debtor if no plan at all was filed, and so he proceeded to file the Plan sponsored by Finnigan and the Imundos represented by Kallen in that filing to be the Debtor's Plan.

39. Kallen filed the foregoing plan of reorganization (the "Plan") on January 28, 1997. Although modified through an amended plan filed on February 12, 1997, and in details several times thereafter until the Plan was withdrawn in February 1998 following a settlement between the factions, essential aspects of the Plan remained unchanged over that period.

40. The Plan benefited creditors in that it proposed to pay them 100% of their allowed claims. It benefited Debtor in that it provided a means to exit from Chapter 11 and remain in business. The proposed reorganization benefited the post-confirmation Debtor in that it provided for: (1) exercise of the purchase option in its lease, thereby converting very high rental payments into lower mortgage payments; (2) substantial funds for remodeling, expansion, and working capital; and (3) additional management experienced and successful in operating similar clubs to lessen chances that Debtor would have to resort to post-confirmation reorganization. Confirmation of the Debtor's Plan would also have benefited the principals of the Debtor in that the Imundos would have been paid back the $300,000 that they had invested in the Debtor, Michals would have been paid $50,000 for his stock (for which he had paid nothing), and Finnigan would have been issued new stock of the Debtor in return for his continued services. Much about the Plan would, under other circumstances, have been unexceptional. However, it was nonetheless a Plan sponsored by one faction against another, by one director against another, by one officer against another. By filing it, Kallen placed himself on one side of the management and ownership dispute against the other side and knew when he filed it that it had not been approved by the corporate board and was rejected by one of the disputing factions.

41. On February 12, 1997, Michals filed his own plan of reorganization through his

solely-owned company, Michaels Consulting, Inc. (which was a pre-petition creditor of the Debtor) along with creditor Blazer Builders, Inc. (the "Michals Plan"). Paula Jacobi was their attorney. By so acting as a creditor and allying himself with a large unsecured creditor, Michals entered into obvious competition with the Plan filed by Kallen that Imundo had approved.

42. Michals' Plan was amended several times, but in summary it provided (1) for 100% payment of all creditors' allowed claims; (2) that ownership interests in the Debtor would be canceled for no payment and a new company owned by Ann Galioto would become the sole owner of the Debtor in return for funding Michals' Plan; (3) Finnigan and the Imundos would have no further connection with the post-confirmation Debtor; and (4) managers of the Debtor's club (Michals and William Galioto) would continue to manage the Debtor's post-confirmation, and would also constitute the corporate officers post-confirmation. No fresh funds for expansion or remodeling were proposed.

43. Up to the point when the Michals' Plan was filed, the time expended by Kallen in representing the Debtor with respect to the Plan he filed was reasonable under the circumstances, in his attempt to meet a Court-imposed filing deadline. However, the irreparable nature of conflict between the factions became evident and irremediable when the Michals' Plan was filed on February 12, 1997.

44. From January 28, 1997, through numerous meetings and telephone conferences that included counsel for Blazer/Michaels, and counsel for Michals respecting disclosure statements, plan modifications, and substantial discovery activities, and through numerous motions and other pleadings presented to Bankruptcy Judge Sonderby as well as to this Court, Kallen openly and frequently represented the Debtor with respect to the Plan filed by him. At no time during that period did any party in interest present to the Court any protest to the Debtor promoting that Plan, or Kallen's representation of the Debtor with respect to that Plan. To the contrary, counsel for all parties participated in preparing a joint disclosure statement for possible use to describe both plans. Although Blazer and Michaels objected to the Debtor's Plan on a number of grounds, they did not then object to the Debtor's Plan on the grounds that the Debtor and Kallen had no authority to promote it.

45. Determining the technical objections now asserted against the Plan filed by Kallen and raised in the context of objections to his fees would require a full confirmation hearing, and those objections are not capable of determination in the context of the hearing respecting the Second and Third Applications. However, from what has been submitted, it cannot be found either that the Debtor lacked funding to carry out that Plan or that the Plan was frivolous or unquestionably incapable of being confirmed had this Court held a contested confirmation hearing.

46. For the foregoing reasons, the filing of the Plan by Kallen was, when it was prepared and filed, reasonably likely to benefit the estate and was beneficial at the time the services were rendered toward the completion of the case, but once the Michal's Plan was filed the Plan Kallen filed had no value to the estate or its creditors. Work by Kallen to pursue that Plan after the Michals' Plan was filed cannot, for reasons discussed in the Conclusions of Law, be justified or compensated because, from that time forward, his pursuit of that Plan only served one faction against another and did not serve the bankruptcy estate or its creditors.

47. At the outset of the bankruptcy case, Kallen thought he could be bankruptcy counsel for both shareholder factions. Neither faction had bankruptcy counsel, and Kallen, as Debtor's counsel, prepared separate plans of reorganization for both Michals and Imundo/Finnigan. He opined that, "[w]hen the bankruptcy case was first filed, I [Kallen] thought that the two factions would go head-to-head, and I [Kallen] would be babysitting for the Debtor as the Chapter 11 lawyer ... As the case went on ... the future of the company ended up being determined or was sent down a path of being determined by litigation within the bankruptcy, but through dueling Chapter 11 plans. That was okay. That was another way of going about it."

However, as discussed in the Conclusions of Law, once Michals filed his plan, Kallen's pursuit of a "dueling" Plan on behalf of one faction was definitely not "okay."

### Services Relating to Objections to Blazer's Claim

■ 48. On February 5, 1997, Kallen caused Debtor to file its objection to Blazer's $516,000 claim. Debtor also objected to Blazer's "amended claim" and "corrected amended claim," each of which claimed about $520,000. Michals generally supported the Blazer claims and did not favor the objection. Following pretrial proceedings, Kallen conceded that portions of Blazer's claim need not be disputed, leaving about a quarter million dollars in serious dispute. That dispute ultimately went to trial and was taken under advisement. Before it was ruled on, the principals reached their settlement and, with new parties in control of Debtor, the objection was withdrawn and not ruled on.

49. From the time that Debtor's initial objection to Blazer's initial claim was filed through the December 1997 trial of the objection and subsequent post-trial submissions, there were many court hearings, meetings, and telephone conferences that included counsel for Blazer/Michaels Consulting, and counsel for Michals, respecting discovery activities, and many motions and other pleadings were presented to the Court. In these matters, Kallen openly and frequently represented Debtor with respect to its objection to Blazer's claim. At no time did any party in interest present to the Court any protest as to the propriety of Debtor objecting to the Blazer claim or to Kallen's representation of Debtor with respect thereto.

50. Feasibility of either of the Plans on file depended on the amount in which Blazer's claim would be allowed (since each Plan provided for payment of 100% of unsecured claims). Blazer and Michaels Consulting each requested that the Blazer claim be determined prior to the Plan confirmation hearing, and in retrospect the Court's approval of that request was a correct decision in light of the situation then presented.

51. Debtor's objection to the Blazer claim was based on the fact that it was to a large extent undocumented. Finnigan, as president of Debtor and an experienced general contractor, believed that Blazer's claim was inflated and included substantial charges for which he contended Debtor was not liable. To some degree Finnigan's belief was not unreasonable, though many of his concerns and attacks were not supported by the evidence presented.

52. As earlier noted, an evidentiary hearing was held on Blazer's claim and objections thereto, but the issues were resolved before ruling thereon. However, with the benefit of evidence presented, it was clear from that hearing that the Debtor's objection would likely have resulted in a ruling from this Court somewhat reducing Blazer's claim in the range of about $50,000. The contention in the present fee dispute that Debtor's objection to Blazer's claim of $521,000 was unreasonable and that the objection was filed by Kallen only to aid Imundo to effectuate the Plan filed by Kallen was not established by evidence. Debtor's objection was withdrawn only after Michals gained control of Debtor through settlement between the factions, but such withdrawal under that circumstance cannot determine the value of Kallen's service. However, it must be said that components of the objection to the claim were not supported (most notably the contest over whether the ball field construction was authorized and changes therefore were due), and therefore the value of some services by Kallen in pressing the objections must be questioned.

53. For the foregoing reasons, the services provided by Kallen with respect to Debtor's objection to the Blazer claim were somewhat beneficial toward completion of the case, were beneficial to the Debtor's estate, were necessary to the administration of the case, and were reasonable. However, the claim for fees of over $47,000 for work opposing the Blazer claim was excessive and disproportionate to the likely result had a ruling been entered. Therefore, fees for that work will be reduced to a better measurement of the potential value to the estate, and only half of the fees for that service will be allowed.

### Services Relating to Debtor's Adversary Proceeding Against Monarch

■ 54. Debtor's lease with its landlord, Monarch, contained a rider that, in summary, bestowed on Debtor an "exclusive right" to purchase its leased premises until July 31, 2005 (the date of the termination of the lease). On January 20, 1997, when Kallen was formulating the Plan of reorganization he was to file, providing for the exercise of the purchase option, Salvatore Galioto ("Galioto"), a principal in Blazer, advised Kallen that Galioto was within days of closing a purchase of the subject property.

55. Kallen now contends that the purchase of the property by anyone other than the Debtor would have been in violation of said purchase option, though it seems evident that any sale would have been subject to Debtor's option rights. More importantly, it appeared to Finnigan, Imundo, and Kallen that purchase of the property by Galioto would have allowed Blazer to exercise leverage as a creditor in the Chapter 11 case, and such leverage would work for the personal benefit of Michals and against the others. Given the situation wherein the owner Monarch was threatening to terminate Debtor's lease for non-payment thus threatening to void the option, opposition to the sale was actually a tactical step to oppose indirect benefit to Michals. This was Kallen's first step in direct support of one faction against the other, and it did not give any value to the estate or its creditors.

56. On January 21, 1997, on instructions of Finnigan and Imundo, Debtor through Kallen filed an adversary proceeding against Monarch to enjoin it from selling the property to any third party. Although Galioto's representation to Kallen as to his imminent purchase of the property proved to be false, Monarch had been entertaining purchase offers by parties other than the Debtor. After some initial skirmishing, Monarch agreed to a "standstill" order under which it would not take any action to sell the property without prior notice to Debtor, at which time the matter could be litigated in the Bankruptcy Court. In fact, Monarch retained the "standstill" posture for the remainder of the Chapter 11 case.

57. Kallen argues that prosecuting the adversary proceeding against Monarch benefited the Debtor and the Debtor's estate in that it enforced Debtor's lease, preserved a corporate opportunity for Debtor that it exercised in its Plan (and so was beneficial toward the completion of the case), maintained an important foundation of Debtor's plan of reorganization, and prevented undue creditor pressure, without inordinate cost to Debtor. In fact, the adversary case did none of these things. The corporate opportunity could be realized only by preserving the Monarch lease and obtaining funds to exercise the option.[1] Attempts to block one faction from obtaining leverage did not benefit the estate or its creditors one bit. His application to be compensated for work on the adversary case must be entirely denied.

### Timing of Objections to Work of Counsel

■ 58. No party in interest objected formally to Kallen promoting the plan of reorganization he filed, objecting to Blazer's claim, or prosecuting the adversary proceeding against Monarch. While the "Objection to Second Interim Application for Compensation of Laurence H. Kallen" raised such objections, the objectors never made a motion requesting an order directing Kallen to cease such services or otherwise brought the substance of the objection to the Court's attention in a direct fashion or attacks at the time. The "Supplemental Objection to Second Interim Application and First Objection to the Third Interim Application of Laurence Kallen for Allowance of Compensation" and the "Fee Objection Clarification" were not filed until after Kallen ceased providing services to Debtor.

59. The objections to the Second and Third Applications contest actions taken by the Debtor, and by Kallen as the Debtor's attorney, that were open, conspicuous, and unmistakable at the time undertaken and that commenced in excess of a year before the hearing on the applications. According-

---

1. The sale of the real property leased to Debtor could not have altered or affected the legal leasehold interests of Debtor in the real property, which would have remained subject to the lease. *Daehler v. Oggoian*, 72 Ill.App.3d 360, 28 Ill.Dec. 250, 390 N.E.2d 417 (1st Dist.1979).

ly, Kallen has argued that the reproofs raised in objections to the fee applications could have been raised at the time of said actions.

60. In a marginal case, the failure to file any protests to actions of counsel when openly performed and to bring any such objections to the attention of the Court would tend to cast doubt that the objectors felt Kallen was acting in a conflicted position. However, for reasons described in the Conclusions, this was not a marginal case but became a clear case of conflict wherein counsel for Debtor began to act for one faction against another, and he cannot look to the estate to pay for work of that nature. He performed work for one faction at his peril and risk despite lack of formal objection at the time.

### Services Relating to "Ownership and Control"

■ 61. The small amount of time Kallen spent on issues relating to ownership and control of Debtor and the adversary filed by one faction to resolve those issues was only as an observer when the factions presented motions in court, to give some advice that related strictly to bankruptcy procedures relating to the negotiation of a settlement agreement (that collapsed), and similar minor, passive activities. Kallen took no part in the adversary proceeding over ownership and control between the factions, and his services for which he seeks payment are fully compensable.

### Timeliness of Second Application for Interim Compensation

■ 62. The Second Application was filed with the Court and served on counsel on September 4, 1997, and filed with the Bankruptcy Clerk's office September 5. The Court's order that set a deadline of September 4, 1997, for the filing of fee applications was based on the premise that the confirmation hearing would begin on October 9, 1997. That did not occur. In fact, substantial time passed and substantial legal services were rendered past the original deadline, rendering the deadline moot. Accordingly, the material contained in the Second Application could have been contained in the Third Application without penalty. No party in interest was prejudiced by the *de minimus* violation

of the deadline and, under the circumstances, it would be inequitable to deny the Second Application for that reason.

### Miscellaneous

62. Factual findings contained in the Conclusions of Law will stand as further Findings of Fact, and any conclusions of law contained in the Findings of Fact will stand as further Conclusions of Law.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction to determine the Second and Third Applications pursuant to 28 U.S.C. § 1334. This matter is before the Court pursuant to 28 U.S.C. § 157 and Local General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. Venue lies properly under 28 U.S.C. § 1409. This matter constitutes a core proceeding 28 U.S.C. § 157(b)(2)(A) and (B).

■ 2. The Court has an independent duty to consider the merit of compensation that counsel for a debtor seeks, even if no party in interest has objected. *See In re Pettibone Corp.*, 74 B.R. 293, 300 (N.D.Ill. 1987).

■ 3. Kallen has the burden of demonstrating his legal entitlement to his claimed fees. *See In re Wire Cloth Products, Inc.*, 130 B.R. 798 (Bankr.N.D.Ill.1991).

■ 4. Ethical considerations should be considered when ruling on propriety of awarding professional fees. *See In re Kendavis Industries International, Inc.*, 91 B.R. 742 (Bankr.N.D.Tex.1988).

■ 5. The Illinois Supreme Court Rules, which include the Code of Professional Responsibility and the *ABA Model Rules of Professional Conduct*, are strong indicators of public policy in attorney conduct, and the opinions thereon should be accepted as persuasive. *See Mustang Enterprises, Inc. v. Plug-In Storage Systems, Inc.*, 874 F.Supp. 881 (N.D.Ill.1995); *Kaplan v. Pavalon & Gifford*, 806 F.Supp. 192 (N.D.Ill.1992); *In re Del Grosso*, 111 B.R. 178 (Bankr.N.D.Ill. 1990); and *In re Consupak, Inc.*, 87 B.R. 529 (Bankr.N.D.Ill.1988).

6. The Rules of Professional Conduct for the Northern District of Illinois ("ROPC") apply in all proceedings and matters before the Bankruptcy Court. Local Bankruptcy Rule 608. An attorney hired to represent a corporation represents that corporation through its duly authorized constituents. ROPC 1.13(a). This can include officers, directors, employees, shareholders, and other such individuals. Comments to ROPC 1.13.

7. Where different factions arise during a corporate conflict, "the lawyer should advise any constituent whose interests the lawyer finds adverse to that of the organization of the conflict or potential conflict of interest, that the lawyer cannot represent such constituent, and that such person may wish to obtain independent representation." Comment to ROPC 1.13.[2] However, where such factions arise, the corporation may provide funds for separate legal representation. Comments to ROPC 1.7.

■ 8. Kallen, as Debtor's counsel, owed an unqualified duty of loyalty to the Debtor corporation, not to any individual shareholder or director. This duty of loyalty cannot be waived. See Metro–Goldwyn Mayer, Inc. v. Tracinda, 36 Cal.App.4th 1832, 1840, 43 Cal.Rptr.2d 327, 332 (1995).

■ 9. Corporate counsel should "refrain from taking part in any controversies or factional differences among shareholders as to control of the corporation, so that he or she can advise the corporation without bias or prejudice." Id. at 1842, 43 Cal.Rptr.2d at 333. In a struggle between shareholders for control of a corporation, the corporation's counsel cannot represent either side without a potential for conflict of interest.

10. The policy underlying prohibition of any conflicts of interest by corporate counsel is implicated even more where the attorney, such as Kallen, represents a bankrupt estate. See In re Diamond Mortgage Corp. of Illinois, 135 B.R. 78, 90 (Bankr.N.D.Ill.1990).

■ 11. An estate is a fiduciary for both the creditor body and equity ownership. See

In re Diamond Mortgage Corp. of Illinois, 135 B.R. 78 (Bankr.N.D.Ill.1990), and In re Benjamin's–Arnolds, Inc., 1997 WL 86463, at *8 (Bankr.D.Minn. Feb.1997).

■ 12. Therefore, a bankruptcy counsel for the debtor is prohibited from representing conflicting interests. Such a representation, even defacto, breaches the impartial, undivided loyalty owed by the bankruptcy counsel. See In re Paine, 14 B.R. 272, 274 (W.D.Mich.1981).

■ 13. After the Michals' Plan was filed on February 12, 1997, it was clear that an actual conflict of interest existed between the ownership factions and their views as to the best interests of Entertainment, Inc. There was an active competition between two interests in which one interest (Imundo and Finnigan's interest in taking control of the company by eliminating the interest of Michals) could only be served at the expense of the majority shareholder, Michals. See In re Diamond Mortgage Corp. of Illinois, 135 B.R. 78 (Bankr.N.D.Ill.1990) (noting that an actual conflict of interest is defined as "an active competition between two interests, in which one interest can only be served at the expense of the other, and finding an actual conflict where an attorney for the estate engaged in actual and potential conflicts of interest").

14. Kallen's actions in pursuing the Plan approved by Imundo and Finnigan to further their interests over those expressed by the Plan once it was filed by Michals constituted a conflict of interest. See Kendavis Industries International, Inc., 91 B.R. 742 (Bankr. N.D.Tex.1988).

■ 15. Denial of fees is required after counsel performs services in conflict of interest, although so long as there is only a potential future conflict allowance of fees is within the discretion of the Court. See Diamond Mortgage Corp. of Illinois, 135 B.R. at 92.

16. Kallen cannot receive compensation for his services on the Plan he filed after

---

**2.** Although Canon 9 of the ABA Model Code of Professional Responsibility required that an attorney avoid even the appearance of impropriety, such a vague concept of disqualification is inapplicable in the Northern District of Illinois. Comments to ROPC 1.9.

February 12, 1997; those services were tainted by Kallen's conflict of interest once Michals filed his Plan. *See Wolf v. Weinstein,* 372 U.S. 633, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963); *Woods v. City National Bank & Trust Co.,* 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941).

17. When, as in this case, the actual dispute in a bankruptcy proceeding is a battle between factions for control of the corporate debtor, the legal work done on behalf of one of the factions is not compensable from the estate. *See In re Grabill,* 110 B.R. 356 (Bankr.N.D.Ill.1990), and *In re Transamerican Freight Lines, Inc.,* 40 B.R. 88 (Bankr.E.D.Mich.1984).

18. While the law does not permit Kallen to be compensated from the estate for work done at any time to advance the desires of Imundo and Finnigan to take control of Debtor and eliminate Michals' ownership interest (*See In re Sound Radio, Inc.,* 145 B.R. 193 (Bankr.D.N.J.1992), and *In re MFlex Corp.,* 172 B.R. 854 (Bankr.W.D.Tex.1994)), it has not been proven by a preponderance of evidence that Kallen was initially so retained or intentionally so employed.

19. Even though Kallen was disinterested at the beginning of the case, compensation should not be allowed to Kallen for work done during the case after his actions became not disinterested by directly aiding the minority shareholders and putative director of the Debtor. *See* § 328(c) of the Bankruptcy Code and *In re Office Products of America, Inc.,* 136 B.R. 983 (Bankr.W.D.Tex.1992).

20. After the point when Kallen took instructions for and worked with Imundo and Finnigan to advance the interests of their shareholder faction, he left the Debtor without a voice and breached his duty to be neutral. This precludes any compensation award to Kallen for his work after that point. *In re Chou–Chen Chemicals, Inc.,* 31 B.R. 842 (Bankr.W.D.Ky.1983).

21. Even if there were some incidental benefit to Debtor from some of Kallen's services pursuing the Plan after Michals filed his Plan, those services essentially benefited one faction and cannot be paid for from the estate. *See In re Clayton Grain Elevator,* 30 B.R. 760 (Bankr.W.D.La.1983), and *In re Zweig,* 35 B.R. 37 (Bankr.N.D.Ga.1983). *See* Section 330(a)(A)(ii)(I) of the Code.

22. A Debtor's counsel's fees must at least be significantly reduced after counsel begins to act at the behest of one of the feuding shareholders against another. *See In re McNar,* 116 B.R. 746 (W.D.Tex.1990).

23. Kallen's fiduciary duty was to Debtor, not to Imundo/Finnigan as shareholders. Therefore, fees cannot be awarded to him for services he performed after the point it became clear that he was acting for the benefit of those individuals. *See In re Woodward East Project, Inc.,* 195 B.R. 372 (Bankr.E.D.Mich.1996); *In re Sidco,* 173 B.R. 194 (E.D.Cal.1994); *In re Bellevue Place Associates,* 171 B.R. 615 (Bankr. N.D.Ill.1994).

24. Kallen cannot be awarded fees for the services on the Plan he filed after Michals' Plan was filed. He was then not disinterested and acted in conflict with his duty as counsel for Debtor when his services were for the benefit of Imundo and Finnigan. *See In re DN Associates,* 160 B.R. 20 (D.Me. 1993).

25. Both the applicable statutes and relevant court decisions provide that a debtor's counsel cannot be awarded compensation from an estate where his services "were not reasonably likely to benefit the debtor's estate," regardless of the sincerity of the professional. *See Conrad, Rubin & Lesser v. Pender,* 289 U.S. 472, 53 S.Ct. 703, 77 L.Ed. 1327 (1933); *In re Ryan,* 82 B.R. 929 (N.D.Ill.1987) (compensation can be given only if the estate benefited); and Section 330(a)(4)(A)(ii)(I) of the Code.

26. The Court should not award compensation from an estate where the services "were not necessary to the administration of the case." *See* Section 330(a)(4)(A)(ii)(II) of the Code; *In re Lederman,* 997 F.2d 1321 (10th Cir.1993); *In re Kohl,* 95 F.3d 713 (8th Cir.1996); *In re Wire Cloth Products, Inc.,* 130 B.R. 798 (Bankr.N.D.Ill.1991).

27. The filing of some plan by Debtor was reasonably necessary to administration of this case. Although the Objectors

argue that the Plan filed by Kallen was not confirmable, attorney's fees can be awarded Kallen for work preparing the Plan to be filed. It cannot be said that such work was not reasonably likely to benefit the estate or that the Plan was presented or as it might have been amended was unconfirmable.

28. The Imundo–Finnigan sponsored Plan was initially to be proposed by Debtor along with a Debtor's Plan as proposed by Michals. A corporation can propose a plan only if such action is approved by the Board of Directors. *See* 805 ILCS 5/8.05 *et seq.*; *In re Dark Horse Tavern,* 189 B.R. 576 (Bankr. N.D.N.Y.1995). Under Illinois law, a business corporation's board of directors can act only by unanimous consent or at a directors' meeting. *See* 805 ILCS 5/8.05 *et seq.* Neither occurred at any time postpetition. However, up to the point that Michals filed his Plan, all the Debtor's directors tacitly acquiesced and impliedly consented to the preparation and filing by Kallen of two plans, each sponsored by one faction. Nothing in the Bankruptcy Code prevents a debtor from filing more than one plan. For a time as Kallen walked a tightrope between the two factions, each agreed to his proposed course of action, at least up to the point that it was clearly rejected and opposed by one faction.

29. Laches does not bar Objectors' position as to fees sought for work done after Michals filed his Plan. Since February 12, 1997, Kallen had knowledge that an objection to his fees would likely be made if he sought compensation for his services supporting the Plan he had filed in support of the Imundo interests that Objectors have now objected to. *See In re Dark Horse Tavern,* 189 B.R. 576 (Bankr.N.D.N.Y.1995).

### CONCLUSION

30. For reasons stated, Kallen's fees for services opposing the Blazer claim are reduced by 50%, his fees for services in opposing a sale of the property by Monarch are entirely disallowed, and his fees for his work after February 12, 1997, on the Plan filed by him are entirely denied.

For reasons set forth during the hearing, an additional 2½ hours of Kallen's time are disallowed. All other objections are overruled and all remaining fees and expenses sought are to be allowed. Counsel will propose an order in accord with the foregoing rulings.